## Raney v. Commonwealth.

June 20, 1941.

G. D. Milliken for appellant.

Hubert Meredith, Attorney General, and A. E. Funk, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

The appellant was indicted for murder, convicted of voluntary manslaughter, and sentenced to twenty-one years imprisonment. His victim was Archer Moore, twenty-three year old popular football player, who had attended Western State Teachers College intermittently for several years. The killing took place on the streets of Bowling Green in the early morning hours of March 31, 1940, after appellant, a railroad policeman, had pursued in his car and forced to the curb an automobile in which Moore and several men and women student companions had fled from the place where appellant had observed it parked in front of a negro's house near the railroad property in a disreputable section of the city. Admittedly, Moore and his male companions had been drinking heavily; and appellant claimed that he shot Moore in self-defense, after he, appellant, had been beaten almost into insensibility with his own black-jack.

The students testified that they had been guilty of no misconduct; that they had stopped in front of the house to ascertain if a dance was in progress which they might be permitted to witness; that they were unarmed; and that the shooting took place after the original difficulty, in which they had been compelled to hold appellant to prevent him from committing an assault, had subsided, and while Moore, who had walked away, was turning around to face appellant in response to a blow struck by appellant with a flashlight after he had been released. The Commonwealth's evidence indicated that appellant also had been drinking; and testimony introduced by him substantiated his claim that he had been severely struck on the head by a black-jack or similar weapon. But we are not at present concerned with what took place before the killing or with the motives which inspired its participants, but with what occurred thereafter.

Appellant immediately surrendered, and on the next

day, was indicted. On April 3d, his bond was fixed at $10,000, and the case set for trial on April 16th. Great public excitement prevailed, and contributions were made by the student body to raise funds with which to employ special counsel to aid in the prosecution. Crowds, which the police found it necessary to disperse, gathered about the jail and courthouse and numerous statements were overheard to the effect that appellant should be lynched. Sureties on appellant's original bond, fixed by the County Judge at $5,000, were induced by pressure exerted upon them to refuse to sign his bond of $10,000, fixed by the Circuit Court following his indictment. After making an investigation and becoming convinced that appellant was in danger because of the hostility manifested by the community, the Chief of Police advised appellant to leave Warren County, and, in company with other peace officers, escorted him out of the city to protect him from violence.

These and other facts showing the bitter feeling engendered against appellant, in part, no doubt, by the widespread influence of the student body of which Moore was a member, are gathered from the petition for a change of venue and affidavits of officials in support thereof filed on April 16th. Clearly, they indicated the impossibility of appellant's obtaining a fair and impartial trial in that jurisdiction at that time, but the Trial Court overruled the application, increased appellant's bail to $15,000, and, on appellant's motion, reassigned the case for trial to the second day of the September term. However, when the case was called for trial on September 10, 1940, appellant announced ready for trial, and in his motion for a new trial following the verdict of ''guilty,'' failed to list among the grounds therefor the refusal of the Court to grant a change of venue. Hence, this error is not available to appellant on this appeal, and we have recited the facts relative to the conditions prevailing immediately following the homicide merely to supply the background of the events occurring during the trial which have convinced us that it was not fair or impartial.

These events are thus summarized in the joint affidavit of G. D. Milliken and John D. Rhodes, appellant's counsel, filed in support of appellant's motion for a new trial:

"The trial consumed four (4) days and during the entire time the room was either full or crowded with persons standing in the aisles. The hostility of the crowd in the courtroom to the defendant and their sympathy in the prosecution was plainly apparent during the entire four-day period. Following the beginuning of the introduction of testimony, frequent points in the testimony favorable to the Commonwealth were followed by expressions of approval and points unfavorable to the defendant were followed by expressions of derisive laughter or snickernig. This was both audible to the jury and the smiling and grinning from spectators was apparent to them.

"In our judgment, as members of the bar for a long number of years, we state that the hostile feelings to the defendant on the part of the crowded courtroom outside of the jury box, must have been apparent to the jury. The Judge of the Court frequently admonished the crowd in the courtroom and threatened to clear the courtroom, but never did so. There were however many instances of laughter and snickering, but somewhat more subdued but plainly audible to the jury, where no admonitions were given. The record will show frequent objections upon the part of defendant's counsel. The Court held one night meeting on Thursday night where the Court ruled upon adjournment on Thursday afternoon that no person would be permitted in the courtroom who could not find seats, and that no person would be permitted to stand in the aisles. The lobby of the courthouse outside of the circuit courtroom was so full that they pressed against the door leading to the circuit courtroom and in part broke it down.

"In the judgment of the affiants the hostile feeling upon the part of the audience and spectators in the courtroom materially affected the verdict and prejudiced the minds of the jury."

The following excerpt is from the affidavit of the official stenographer filed in support of the motion:

"That his record, when written up, will show many instances of laughter upon the part of the audience and of reproof and admonition upon the part of the

Court. However my record will not show many instances of waves of laughter or snickering on the part of the audience where no admonition on the part of the Court was given at that particular time. There were frequent instances during the course of the trial of laughter on the part of the audience, some of which were louder and more general than others.''

Not all of the facts stated in these affidavits are disclosed by the record in such a manner as to authorize us to consider them (Hamlin v. Commonwealth, 287 Ky. 22, 152 S. W. (2d) 297), but that the crowd in the courtroom throughout the trial manifested its feelings frequently is apparent from the notations of the official stenographer appearing in the transcript of testimony. We quote the following:

"Mr. Rhodes: Now, Judge, if there is to be this unseemly laughter, I want to make a solemn protest against it, and let it go of record.

"Mr. Burton: I think that laughter is out in the hall.

"Mr. Rhodes: No, not all of it.

"The Court: Mr. Shields (deputy jailer), I am going to have to ask you to fasten that door in some way. I cannot have that door opened and closed so much, and the noise and talk and murmuring and confusion around that door. * * * '' (There was laughter in the courtroom.)

"The Court: I asked when we started that the crowd be absolutely quiet. It is imperative that you do so, or else I am going to have to clear the courtroom. I dislike to do it, but I must insist that you remain quiet and refrain from any commotion or any expression of any sort. * * * '' (There was some laughter in the courtroom.)

"Mr. Milliken: If that occurs again, I am going to make a motion to discharge this jury. Put that in the record.

"Mr. Rhodes: I am going to make a motion that the official stenographer put 'Laughter' in the record every time it happens.

"The Court: Do that, Mr. Stenographer.''

Thereafter, the official stenographer noted many similar incidents followed by threats from the Court that if they were repeated he would clear the courtroom, but the threats were never carried into execution.

At the conclusion of the testimony, appellant's counsel moved to discharge the jury. We quote:

"Mr. Rhodes: I want the record to show a motion to discharge the jury and continue the case, upon the ground of the repeated waves of snickering and laughter in the crowd, favorable to the Commonwealth, notwithstanding the repeated admonitions of the Court. I want that to be shown as the ground of the motion."

Among the grounds set forth in appellant's motion for a new trial was the following:

"Because during the course of the entire trial there was manifest an audible expression in the audience of hostility to the defendant, which was evidenced by laughter and snickering at many points in the testimony hostile to the defendant or supposed to be unfavorable to him; and also on many other occasions when testimony was given favorable to the Commonwealth. The Court attempted to control these expressions of hostility, but was unable to do so. The Court several times threatened to clear the courtroom if these expressions were repeated, but this was not done, and they continued until the conclution of the case, to all of this defendant by counsel repeatedly objected but without avail."

The principle that one accused of crime is entitled to a fair and impartial trial has become ingrained in Anglo-Saxon jurisprudence. It is discernible in many of the clauses of Magna Carta, and, although not expressly commanded by either the Federal or State Constitutions, it is treated as axiomatic in many reported cases. It forms the basis of Subsection 7 of Section 271 of our Criminal Code of Practice, authorizing a new trial:

"If from the misconduct of the jury, or from any other cause, the court be of opinion that the defendant has not received a fair and impartial trial."

The essentials of a fair and impartial trial are thus set forth in the case of Fisher v. State, 145 Miss., 116, 110 So. 361, 365:

"Perhaps no precise definition can be given it [a fair trial], but it certainly must be one where the accused's legal rights are safeguarded and respected. There must not only be a fair and impartial jury and a learned and upright judge to instruct the jury and pass upon the legal questions, but there ought to be an atmosphere of calm, in which the witnesses can deliver their testimony without fear and intimidation, and in which the attorneys can assert the defendant's rights freely and fully, and in which the truth may be received and given without fear of violence."

More directly in point is the following statement quoted from Taylor v. State, 55 Ariz. 29, 97 P. (2d) 927, 932:

"In serious cases the jury is kept together under the care of an officer and no juror is permitted to talk to any one about the case and is denied the privilege of reading newspapers containing accounts of the proceedings of the trial. These precautions would be frequently defeated, however, if those in the court room may by applause show their approval of an appeal by the attorney for the state or by one for the defense, because it is plain that under such circumstances the jury is given some idea of how a part of the public regards the case and may be unconsciously influenced by it. The court's instruction to disregard it did not, under the circumstances, we feel, remove the error."

It is true that we have written in several cases that particular acts of misconduct by spectators did not entitle the defendant to a new trial when the Court had admonished the jury to disregard the misconduct and it was not shown that the jury had been prejudiced thereby. But we are unwilling to apply that doctrine when, as here, the misconduct was practically continuous and the spirit of revenge is shown to have dominated the community from which the jurors were drawn and in which the trial was held.

All other questions are reserved.

Judgment reversed for proceedings consistent with this opinion.