Bernard Keith PUTTY, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1998–SC–1120–MR.

Supreme Court of Kentucky.

Oct. 26, 2000.

Elizabeth E. Vaughn, Henderson, for Appellant.

A.B. Chandler, III, Attorney General, Frankfort, Todd D. Ferguson, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellee.

COOPER, Justice.

Appellant Bernard Keith Putty was convicted in the Hopkins Circuit Court of four counts of criminal solicitation of the murder of his father-in-law, Gary Clark, and was sentenced to confinement in the penitentiary for a total of thirty years. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). At trial, the Commonwealth introduced evidence, largely obtained from Appellant, himself, that Appellant and Clark were part of a criminal syndicate and that Appellant's motive for soliciting Clark's murder was that Clark had either threatened or agreed to inform law enforcement authorities about the criminal activities of the syndicate. Appellant claims on appeal that (1) a written plea agreement with respect to his involvement in the syndicate granted him immunity from prosecution for these charges; (2) the same plea agreement precluded the admission into evidence of sworn statements which he made pursuant to that agreement; and (3) evidence of his involvement in the syndicate and of the fact that Gary Clark was, indeed, murdered was irrelevant and should have been suppressed.

## I.  FACTS.

Appellant and his wife, Amy Clark Putty, Amy's father and stepmother, Gary Clark and Norma Aragon Clark, Norma's brothers, Reuben Aragon and Tony Trevino Aragon, and numerous other persons were engaged in a criminal operation in which they purchased large quantities of marijuana in Texas and transported it to Hopkins County, Kentucky, for resale. For some time prior to October 1995, this criminal syndicate had been the subject of an investigation by the Federal Bureau of Investigation (FBI), the Pennyrile Narcotics Task Force, and the Madisonville, Kentucky, Police Department. However, these agencies had been unsuccessful in either penetrating the syndicate or obtaining sufficient proof to make an arrest.

In September 1995, while Gary Clark was incarcerated in the Hopkins County Detention Center in Madisonville on domestic violence charges brought by his wife, he telephoned Appellant and threatened to "rat out" the whole marijuana syndicate if he was not released from jail. Clark was subsequently released, but was rearrested on October 23, 1995 on contempt charges, again related to domestic violence alleged by his wife. On October 27, 1995, Clark contacted FBI Agent Bill Frank by telephone and offered to provide information about the marijuana syndicate. Frank interviewed Clark at the Hopkins County Detention Center on October 30, 1995, and obtained substantial information concerning the activities of the syndicate, including Appellant's involvement in its criminal activities. Clark was released from custody on November 29, 1995. Ten days later, he was found dead from a

gunshot through the center of his forehead.

On October 31, 1995, two Hopkinsville, Kentucky, police officers were shot and seriously wounded by Reuben Aragon and Tony Trevino Aragon after stopping the brothers on suspicion of operating a motor vehicle while under the influence of alcohol (DUI). The Aragons escaped. Knowing of the Aragon–Clark–Putty connection, law enforcement officers questioned Appellant and his wife in an attempt to learn the whereabouts of the Aragon brothers. During that interview, a detective with the Pennyrile Narcotics Task Force advised Appellant that the police were close to indicting him and offered him a "deal" in exchange for his cooperation against the other syndicate members. Appellant indicated he would contact a lawyer and consider the offer. On January 23, 1996, Appellant and his wife, their attorney, and the Commonwealth's attorney for Hopkins County executed a written "Plea Agreement" (though no charges were then pending against Appellant), which provides:

1. The Commonwealth of Kentucky agrees to indict Bernard Keith Putty and charge him with one (1) count of trafficking in marijuana over eight (8) ounces but under five (5) pounds. Class D Felony. Once the Indictment is returned, the Commonwealth of Kentucky will set a $10,000.00 cash or property bond and will allow Amy's parents to post their property as surety.

2. Bernard Keith Putty will be allowed to plead guilty on the Indictment and will receive a one (1) year sentence from the Commonwealth of Kentucky. The sentencing will be deferred generally and Bernard Keith Putty will be allowed to remain free on his bond pending the sentencing.

3. In exchange for the plea, Bernard Keith Putty agrees to testify truthfully concerning his activities and the activities of his associates in an illegal narcotics distribution syndicate that has been operating in Hopkins County, Kentucky.

Bernard Keith Putty and his wife, Amy Putty[,] will give a sworn statement at the Madisonville Police Department on January 23, 1996 with the understanding that the statement is truthful and is a full and complete description of the activities of Bernard Keith Putty and his associates. Failure to testify truthfully will negate the Plea Agreement.

4. Bernard Keith Putty will also agree to testify truthfully against persons implicated in the syndicate in any state or federal proceeding. If Bernard Keith Putty refuses to testify or alters his testimony substantially from that which is given in the sworn statement of January 23, 1996, then the Plea Bargain Agreement negotiated with the Commonwealth may be set aside by the Commonwealth subject to the approval of the Hopkins Circuit Court.

5. Amy Putty will be granted complete immunity from any criminal proceeding arising out of the operation of the syndicate in exchange for her truthful testimony. Amy Putty will also be available to testify in any state or federal proceeding as may be required by law.

6. *Bernard Keith Putty will be granted immunity from additional prosecution as a result of his actions* in exchange for this immunity [sic] and will assist state and federal authorities in their investigation in and to this illegal narcotics syndicate.

7. [Provision for disposition of property acquired by illegal activities.]

8. The parties acknowledge that *if the Commonwealth of Kentucky defaults under the terms or conditions of this Agreement that the statements made by Bernard Keith Putty and his wife, Amy Putty[,] would be inadmissible* as would be the fruits of the efforts of the law enforcement officers resulting from subsequent investigations into those statements. However, Bernard Keith Putty and Amy Putty acknowledge that the Commonwealth of Kentucky has collect-

ed intelligence involving them and the Commonwealth of Kentucky would be free to proceed in the event that Bernard Keith Putty and Amy Putty fail to comply with the terms of their agreement to the extent that the Commonwealth discovered information or intelligence exclusive of the statements made by Bernard Keith Putty and his wife. (Emphasis added.)

Pursuant to the agreement, Appellant then gave an oral statement, later reduced to 125 typewritten pages, in which he identified the other members of the syndicate, outlined its structure and method of operation, and admitted his involvement in it. He was also questioned about the death of Gary Clark, but claimed to have no knowledge of who committed that crime. Largely as a result of Appellant's information and cooperation, the marijuana syndicate was broken and its members successfully prosecuted.

On December 16, 1997, Appellant was indicted on these charges of criminal solicitation to murder. At trial, Ronald Kittinger, a member of the syndicate, testified that Appellant solicited him to kill Gary Clark on two occasions. The first occurred while Clark was in jail on the first domestic violence charge. According to Kittinger, Appellant told him that Clark was going to get them in trouble and that they needed to get rid of him. Appellant offered to pay Kittinger $10,000.00 if he would kill Clark. On October 31, 1995, Appellant told Kittinger that Clark was "ratting" to the FBI and again offered to pay Kittinger $10,000.00 to kill Clark. Kittinger testified that he refused both offers because he "didn't have the nerve." Another member of the syndicate, Roger Norman, testified that in October 1995, Appellant told him that Clark "needed kill-

ing" and offered him $10,000.00 to "blow Clark's brains out." Norman told Clark he would "think about it," but decided $10,000.00 was not enough. Norman also testified that later that same month, Appellant offered him $25,000.00 to kill Clark. Norman again refused.

## II. IMMUNITY.

"Bernard Keith Putty will be granted immunity from additional prosecution as a result of his actions . . . ." Appellant claims this language in paragraph 6 of the plea agreement granted him immunity from prosecution for any offense with respect to which he was a suspect at the time the agreement was signed. Prior to January 23, 1996, police authorities had received information that Appellant might have been involved in Clark's murder. The Commonwealth asserts that the quoted passage was only intended to immunize Appellant from prosecution for any additional narcotics offenses arising out of the syndicate operation.[1] Appellant relies on *Commonwealth v. Reyes*, Ky., 764 S.W.2d 62 (1989), which holds that a plea agreement is like a civil contract, which, once accepted by the accused, is binding on the Commonwealth subject to the approval of the court. However, the holding in *Reyes* only begs the question in this case, which is: Did the parties to this agreement intend when they signed it that Appellant would be immunized from prosecution for all past criminal conduct of which he was then suspected, including his involvement in the murder of Gary Clark?

As with the construction of any contract, the polar star here is the intent of the parties. The trial judge found that the parties did not intend when they signed this contract that Appellant would be immunized from prosecution for any other

---

1. Actually, in Kentucky, a prosecutor has no authority to immunize anyone from prosecution for a criminal offense. *Commonwealth v. Brown*, Ky., 619 S.W.2d 699 (1981), *overruled on other grounds, Murphy v. Commonwealth*, Ky., 652 S.W.2d 69 (1983), *cert. denied*, 465 U.S. 1072, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984). However, if such a promise is made and a defendant has relied on it and performed his part of the agreement, the Commonwealth will be held to the bargain—not because the prosecutor had the authority to make the agreement, but to preserve the integrity of the Commonwealth. *Id.* at 702.

offenses except controlled substances offenses related to the operation of the syndicate. We agree.

*Commonwealth v. Reyes, supra*, holds that resort can be had to contract law to determine the intent of the parties to a plea agreement. A remarkably analogous case is *Blevins v. Riedling*, 289 Ky. 335, 158 S.W.2d 646 (1942). There, Blevins borrowed $1,500.00 from Riedling and secured the debt by mortgages on two pieces of property. Blevins and Riedling were also engaged in a partnership to improve and sell other properties unrelated to those encumbered by the mortgages. Upon dissolution of the partnership, Riedling agreed to assume ownership of the partnership properties and all debts thereon, and to release Blevins from a $50.00 personal account. The written contract by which the partnership was officially dissolved contained the following language: "The said Edward M. Riedling hereby releases the said Alfred Blevins and Leona Blevins, his wife, *from any and all charges of whatever nature* against them," and "it is mutually agreed and understood by and between the parties ... that *all indebtedness* of each party against the other is hereby paid, satisfied and cancelled, and that the special partnership and any partnership agreements and arrangements by and between the parties hereto is hereby dissolved as of this date." (Emphasis added.)

Blevins claimed that the release of "any and all charges" and "all indebtedness" included the $1,500.00 debt which was secured by the mortgages and which was unrelated to the partnership. Our predecessor Court held that the broad language of the contract was sufficiently ambiguous that the intent of the parties could be ascertained by resort to parol evidence; and that the partnership dissolution agreement was intended to discharge only those debts related to the partnership and not the unrelated debt secured by the mortgages.

The language of Appellant's plea agreement is much narrower in scope than the language of the contract at issue in *Blevins, supra* . All of the negotiations in this case pertained to the marijuana syndicate and Appellant's involvement in it. Every paragraph of the plea agreement pertains to a resolution of the controlled substances charges against Appellant in exchange for Appellant's agreement to cooperate in the prosecution of other members of the syndicate. There is not one word in the agreement about the murder of Gary Clark. Appellant's attorney did not even know when the agreement was signed that Appellant was suspected of being involved in Clark's murder. Remember, the agreement was signed before Appellant gave his sworn statement to the police. After more than twenty typewritten pages of questions concerning Appellant's knowledge or suspicions with respect to the Clark murder, his attorney interrupted and asked: "I need to know, is my client a suspect in this murder case?" If Appellant's attorney did not know at the time the plea agreement was signed that Appellant was a suspect in the Clark murder case, the agreement could not have been intended to grant him immunity from prosecution for his involvement in that offense.

## III. USE OF STATEMENTS AT TRIAL.

In order to prove a motive for Appellant's solicitations of Clark's murder, the Commonwealth proved the existence of the narcotics syndicate, the involvement of Appellant and Clark in that syndicate, and Clark's threat and subsequent decision to inform the authorities about the syndicate's activities. Some of this evidence was gleaned from the sworn statement given by Appellant to the police pursuant to the plea agreement on January 23, 1996. Appellant asserts that the use of these statements against him violated paragraph 8 of the agreement. We disagree.

Paragraph 8 provides that Appellant's statements would be *inadmissible* in a

subsequent prosecution "if the Common-wealth of Kentucky defaults under the terms or conditions of this Agreement ." Since the Commonwealth did not default under the terms and conditions of the agreement, the statements were not *inadmissible, i.e.,* they were admissible.

Appellant asserts that the oral explanation of the plea agreement given by the Commonwealth's attorney and defense counsel after the agreement was signed and before Appellant began his sworn statement requires a different result:

> *Commonwealth's attorney:* And the, this plea agreement is the full agreement that we've reached and there are no other promises or warranties or anything that either one of us has made that are not on this document.
>
> *Defense counsel:* There aren't any.
>
> *Commonwealth's attorney:* And the understanding for the record is *as long as the state of Kentucky complies with the terms of this agreement, we will be allowed to use the information that they provide in our continuing investigation,* the understanding being that Mr. Putty will be indicted by our grand jury and charged with one count of trafficking in marijuana between eight ounces and five pounds which is a Class D felony and he will receive a sentence of one year on that with no recommendation from the Commonwealth attorney as to probation. He will receive a reasonable bond that being $10,000 cash or $20,000 property, that he will enter a guilty plea of which his statement tonight has [sic] made a condition. He will agree to testify in any state or federal proceeding arising out of the investigation, to testify consistent with what he says tonight. Should he renege on his testimony then we would have the option of setting aside the plea. *As long as the state complies with this, this information will be used against them they will have signed their Miranda rights.* At the same point of time *should the state or federal government renege* and should we attempt to take action against them based on what

they said tonight other than that which has been stated it is understood that the statements made on this tape would not be used nor any fruit from those statements. Is that a full and complete understanding?

> *Defense counsel:* Any use or derivative use of this information would be completely forbidden.
>
> *Commonwealth's attorney:* Gentlemen is that is your understanding of what we have negotiated this day?
>
> *Appellant:* Yes.

(Emphasis added.)

This exchange but reaffirms that the agreement precludes the Commonwealth from using Appellant's statements against him only if the Commonwealth failed to comply with, *i.e.,* reneged on, the terms of the agreement. Since the Commonwealth did not renege on its obligations under the agreement, it was not precluded from using the statements in Appellant's subsequent trial for solicitation of the murder of Gary Clark.

## IV. RELEVANCY ISSUES.

■ Appellant asserts that the admission of evidence of his involvement in the marijuana syndicate violated KRE 404(b), which generally proscribes the admission of "other crimes, wrongs, or acts" to prove a person's character in order to show action in conformity therewith. However, such evidence is admissible to prove motive. KRE 404(b)(1); *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986) (evidence that the defendant's wife had obtained a warrant for his arrest for the sexual abuse of his stepdaughter was admissible to prove the defendant's motive to kill his wife).

■ Finally, Appellant claims he was unduly prejudiced by the admission of evidence that Gary Clark was, in fact, murdered. He reasons that since the commission of the crime solicited is not an element of the offense of solicitation, KRS 506.030(1), it was irrelevant to Appellant's guilt or innocence that the vic-

162

tim was actually murdered. He is half right. A conviction of solicitation does not depend upon whether the crime solicited was actually committed. However, by definition, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." That the victim of a solicitation to murder was actually murdered is certainly probative of whether the solicitation occurred (assuming the absence of conclusive proof that the murder was unrelated to the solicitation).

The remaining issue is whether the probative value of the evidence of Appellant's "other bad acts" or of Gary Clark's murder was substantially outweighed by the danger of undue prejudice, KRE 403, a determination properly reserved for the sound discretion of the trial judge. *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999). We have no difficulty concluding that the trial judge did not abuse his discretion in either respect.

Accordingly, the judgments of conviction and the sentence imposed by the Hopkins Circuit Court are affirmed.

All concur.