Kenneth WHITE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2004–SC–000082–MR.

Supreme Court of Kentucky.

Nov. 23, 2005.

As Modified Jan. 6, 2006.

Randall L. Wheeler, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Michael Harned, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, James Havey, Criminal Appellate Division, Office of Attorney General, Frankfort, Counsel for Appellee.

ROACH, Justice.

## I. INTRODUCTION

Appellant, Kenneth White, was found guilty of Complicity to Murder Sam Catron, the Pulaski County Sheriff. He raises five claims of error: (1) that the prosecutor was allowed to introduce significant evidence of other crimes in violation of KRE 404(b); (2) that the aggravating circumstance—that Sheriff Catron was a sheriff involved in the performance of his duties—was not supported by the evidence and should not have been submitted to the jury; (3) that the prosecutor failed to give adequate notice of the evidence of aggravating circumstances to be offered as required by KRS 532.025(1)(a); (4) that the trial court improperly refused his motion for a continuance; and (5) that the trial court improperly refused to give the jury an instruction on facilitation of murder, a lesser-included offense of the complicity charge. Finding no merit to these claims, we affirm Appellant's conviction.

## II. BACKGROUND

On April 13, 2002, a volunteer fire department in Pulaski County held a fish fry for the various candidates vying for public office in the upcoming local election. Sheriff Catron, an incumbent running for re-election, attended the fish fry. Various

other candidates, including Sheriff Catron's political opponent and former deputy, Jeff Morris, were also present.

Sometime after 7:00 p.m., Sheriff Catron left the fish fry to put two cakes he had purchased in his police cruiser, which was parked in the lot outside. As he unlocked his car, Sheriff Catron was shot in the head by a sniper located about 75 yards away. He fell to the ground and died at the scene a few minutes later.

David Brian Hoff, who was in the parking lot at the time of the shooting, heard the shot and saw Sheriff Catron fall to the ground. Almost immediately thereafter, he heard a motorcycle start some distance away. Turning toward the sound, he saw a man in camouflage clothing with a rifle slung over his shoulder riding away on a motorcycle at high speed. Hoff got in his truck and pursued the rider in his truck. A few minutes later, Hoff caught up to the rider, who had wrecked his motorcycle and was attempting to get back on. Hoff hit the motorcycle with his truck, knocking the rider off and sending the rifle flying. Hoff then got out of his truck and approached the rider while brandishing a tire tool. The rider, Danny Shelley, took of his helmet as Hoff approached. Hoff told bystanders to call the police because Shelley had just killed Sheriff Catron, to which Shelley responded, "I did." A sheriff's deputy arrived a short time later and took Shelley into custody.

Kentucky State Police Detective Glenn Todd Dalton interviewed Appellant and Jeff Morris later that evening. They were considered "of interest" to the police because both men were friends of Shelley, the motorcycle Shelley had been riding was registered to Morris, and the last number dialed on Shelley's cell phone belonged to Appellant. In addition to the facts tying the men to Shelley, Morris was Sheriff Catron's political opponent and Appellant was Morris's campaign manager. During the interview, Appellant denied any involvement in the shooting, though he did admit that he had been with Morris and Shelley earlier that day working on the campaign. He indicated that he had heard Shelley talk about killing the sheriff and that Morris had been present when the statements were made. When asked his whereabouts that evening, he claimed that he had been shopping with his wife when the shooting occurred. After interviewing Morris and Appellant, Detective Dalton formally charged Shelley with Sheriff Catron's murder and questioned him about the crime. Shelley quickly admitted to shooting the sheriff and implicated Morris. As the interview progressed, Shelley also revealed that Appellant had been involved in the murder plot.

The next day, police searched Appellant's house. Morris was present when they arrived. During the search, Appellant surrendered a micro-cassette on which he had recorded some of his phone conversations the previous evening. After the search, police drove Appellant to the Commonwealth's Attorney's office for a second interview. During the interview, he offered to gather evidence against Morris, but the police declined.[1] As the police drove him home, Appellant told the officers that he had heard Shelley say the only way to beat Sheriff Catron in the election was "to blow his head off" and that Shelley had bragged about his marksmanship.

The next day, Morris and Appellant were arrested. Shelley, Morris, and Ap-

---

1. The police rejected Appellant's offer because Morris had already begun to cooperate with them and because they believed Appellant had been involved in the crime. Morris and his family were taken into protective custody.

pellant were all subsequently indicted for the murder, and the prosecutor gave each man notice that he intended to seek the death penalty. Morris and Shelley entered plea bargains wherein they accepted sentences of life without the possibility of parole for 25 years in exchange for testifying against Appellant.

At trial, Shelley testified extensively about his relationship with both Morris and Appellant. He stated that he had met Appellant several years before, and they had been involved in the drug trade together. He testified that Appellant had financed Morris's campaign for sheriff, and that the three of them had spoken several times about killing Sheriff Catron. He also claimed that several days before the fish fry, Morris and Appellant told him that Sheriff Catron intended to arrest, and possibly kill, the three of them before the election. He also testified that he was afraid of Appellant because he had bragged about killing people, always carried a gun, had once pointed his gun at someone's face during a business deal in Shelley's presence, and had warned Shelley never to cross him or he would hurt Shelley's family.

Morris also testified about his relationship with Appellant. He had previously been employed as a sheriff's deputy but had resigned because of a dispute with the sheriff over vacation time and allegations that he had stolen a wallet from evidence. A few months after his resignation, he decided to run against Sheriff Catron. Morris claimed that Appellant had approached him in the fall of 2001 and offered to help finance his campaign. He also testified that Appellant originally claimed to want to help because Morris had helped save his brother's life. Appellant eventually spent between $25,000 and $30,000 on the campaign (compared to approximately $5000 of Morris's own money).

During their relationship, Morris learned that Appellant was heavily involved in the drug trade. Morris claimed that when he attempted to back out of the campaign financing arrangement, Appellant threatened him and his family, claiming he had already committed two murders in another county.

Both Shelley and Morris testified that Appellant participated extensively in planning and preparing the sheriff's murder. According to both men, Morris and Appellant purchased the bullets for Shelley's rifle and Appellant was present when they had purchased a battery for the getaway motorcycle. They claimed that Appellant suggested both the place from where Shelley was to shoot as well as the escape route he should take afterward. Shelley further testified that he called Appellant while waiting to shoot the sheriff, and Appellant told him, "Don't let me down. I'm here, don't let me down." The men also testified that Appellant held a grudge against the sheriff over a raid of Appellant's house and the confiscation of a four-wheeler. Speaking of the incident, Appellant had said, "He'll pay for that." Both Morris and Shelley ultimately admitted they had pled guilty to avoid the death penalty.

The prosecutor also presented extensive testimony from other witnesses that Appellant was involved in the drug trade.

Appellant testified in his own defense, essentially disclaiming any involvement in the killing. He repeated his earlier claim that Shelley had stated he wanted to kill Sheriff Catron. He also testified that he had heard Morris say he was going to kill the sheriff because of a possible indictment and arrest for the theft Morris was alleged to have committed when he was employed as a sheriff's deputy.

The jury found Appellant guilty of Complicity to Murder. During the penalty

phase of the trial, the jury found an aggravating circumstance, namely that the murder was an intentional act and that Sheriff Catron had been "a local public official or sheriff engaged at the time of the act in the lawful performance of his duties." Appellant was then sentenced to life without the possibility of parole. He appeals his conviction to this Court as a matter of right. Ky. Const. § 110(2)(b).

## III. ANALYSIS

### A. KRE 404(b) Evidence

■ Appellant's first claim is that the trial court erred in allowing the introduction of evidence of Appellant's drug dealing activities in violation of KRE 404(b). A major portion of the prosecutor's evidence—including the testimony of at least nine of the twenty-two prosecution witnesses—depicted Appellant as a drug dealer. The prosecutor argued at trial, and the Commonwealth argues now, that this evidence showed Appellant's motive for participating in the murder conspiracy, thus it was admissible under KRE 404(b).

Professor Lawson has noted that the "motive" exception to KRE 404(b) should be used only in limited situations:

> If protection against propensity evidence is to be meaningful, courts must limit the use of the "motive" exception to situations where motive is pertinent to the issues of the case and where the other crimes evidence shows a motive to commit the charged offense and not just some offense:
>
> > ... [B]ecause proving motive by other acts may inject serious risks of prejudice ... considerable caution is needed. In the end, other acts that bring such risk should not be admitted to prove motive where the connection with elements in the cases ... is too attenuated, where such elements

are abundantly established by other evidence ..., or where they are not seriously contested.

> Need is greatest and relevance is clearest where the defense is denial of the criminal act, although they can exist in other situations as well.

Robert G. Lawson, *The Kentucky Evidence Law Handboook* § 2.25[5], at 146 (4th ed.2003) (quoting 1 Mueller & Kirkpatrick, *Federal Evidence* § 110 (2d ed.1994)) (footnotes omitted, ellipses and alteration in original). With this limitation in mind, we note that we have previously held that evidence of a defendant's participation in a drug syndicate was admissible as proof of his motive for soliciting the murder of another member of the syndicate who was serving as a police informant. *Putty v. Commonwealth,* 30 S.W.3d 156, 160 (Ky.2000). While there are admittedly some key factual differences between the cases—the murder of a traitorous insider versus the murder of an innocent outsider—the nature of the connection between Appellant's drug activities and the plot to murder Sheriff Catron is very similar to that found in *Putty.*

■ Appellant attempts to distinguish his case from *Putty* by arguing that the prosecution proved no direct connection between the uncharged drug crimes and the murder. He claims no witness testified directly about his motive. In making this argument, however, Appellant essentially asks that we impose an additional requirement on the motive exception, namely that a witness must testify directly that the other criminal activity provided the motive for the charged crime. But we require only that there be a direct connection between the other crimes and the charged crime. This is true even if that connection is the product of a reasonable inference, rather than the direct testimony of a witness.

We conclude that there was such a connection in this case. Even assuming, as Appellant suggests, that there was no direct testimony of any link between his drug activities and Sheriff Catron's murder, there was clearly a sufficient inferential connection to allow the introduction of the drug evidence under the motive exception. Appellant's extensive involvement in the Pulaski County drug trade suggests that he would likely benefit from the murder of a law enforcement official, who would, no doubt, be trying to stamp out illegal drug activity in the region. Appellant's animosity toward Sheriff Catron could also be inferred from the large amount of time and money Appellant devoted to the political campaign of Morris, the sheriff's opponent. Given this evidence, it is a reasonable, if not obvious, inference that Appellant would want the current sheriff out of the way. Sheriff Catron's death, while an extreme measure, would be one way to bring about that chance, especially since it would ease the installation of Appellant's own figurehead candidate as sheriff, in turn, allowing him to expand his illegal drug business with far less interference.

More importantly, however, Morris did testify that this was Appellant's motive. The following exchange took place between the prosecutor and Morris:

Q: I don't know if I asked you, but after the election was over what ... You was going to be sheriff. What was Ken going to do? *What was he going to get out of it?*

A: Me, as sheriff, would have power, and *he wanted to run drugs and alcohol.*

Q: From where?

A: Out of Pulaski County.

Q. That was what he was going to get.

A. Right.

(Emphasis added, ellipsis in original). Though Morris was speaking specifically about Appellant's reasons for participating in the campaign, this testimony clearly established that Appellant was involved with Morris primarily as a way to enhance his drug business in Pulaski County. That Morris failed to delineate in detail exactly why Appellant chose to participate in the shooting does not render the connection nonexistent. Morris's testimony firmly established that Appellant's participation in the campaign was given *quid pro quo* in exchange for the assurance that if Morris were elected, Appellant would be allowed free rein to operate his drug enterprise in the future. Sheriff Catron was an obstacle to both the campaign and the drug enterprise, and the scheme to murder him was simply an extension of both by violent means.

■ Appellant also claims that even if evidence of his drug enterprise was admissible, the "prosecutor went well beyond what was needed . . . ." Appellant correctly notes that we have reversed convictions where the sheer volume and presentation of otherwise admissible KRE 404(b) evidence was error. *See Funk v. Commonwealth*, 842 S.W.2d 476, 481 (Ky.1992) ("The extensive use of overkill was unduly prejudicial and trial error."). But such was not the case here. Appellant was not on trial for a lesser crime, such as a misdemeanor—he had been indicted for a *capital offense*. Therefore, it was necessary that the prosecutor prove that Appellant's motive was correspondingly serious (and not just a petty squabble). Evidence of Appellant's extensive involvement in the drug trade was essential to this purpose. For example, Jessica Wilburn testified that Appellant sold a wide variety of drugs, including cocaine, methamphetamine, and the prescription drugs Xanax and OxiContin. Several other witnesses testified that they regularly purchased

drugs from Appellant. A DEA Special Agent testified that Appellant was a major participant in the drug trade. Tony Hockensmith testified about Appellant's progression from small-time bootlegger, selling alcohol and pills such as Valium, to a veritable drug "kingpin," who dealt extensively in harder drugs, including OxiContin, cocaine, and methamphetamine. Such cumulative evidence was necessary to establish that Appellant was far more than a casual seller, thus lending credence to the idea that he would seek to kill in order to maintain his business. Though the evidence of Appellant's drug activities was certainly voluminous, we also note that it was not the sort of outrageous crime (for example, the evidence of the sexual assault of a small child presented in *Funk*) that would almost inevitably inflame a jury's passion. As such, we cannot conclude that "the evidence of prior misconduct was presented in such a way as to cause undue prejudice." *Id.*

◼ Appellant also argues in passing that the specific proof of the drug enterprise motive was unnecessary because there was proof of another independent motive, namely the evidence that Appellant held a grudge against Sheriff Catron for the confiscation of a four-wheeler. In addressing this contention, we need only note that prosecutors are not limited to proving a single motive. The impetus behind even the simplest acts can be complex, and individuals often have several reasons for pursuing a single course of action. It would disserve the truth-finding process if we were to allow prosecutors to present only one aspect of a defendant's motivation. Though there are limits as to the admissibility of such evidence, prosecutors must often be allowed to plumb the depths of a defendant's motivation, even if it requires proof of multiple motives.

Appellant also makes the near-specious claim that proof of motive itself was unnecessary because it is not an "inseparable component" of the charged crime. We have long held that while motive is rarely an actual element of a crime, it is often relevant to show criminal intent. *E.g., Jillson v. Commonwealth,* 461 S.W.2d 542, 544 (Ky.1970). As we have discussed above, evidence of Appellant's involvement in the drug trade constituted inferential proof of his motive for participating in the conspiracy to murder Sheriff Catron.

Finally, while Appellant has not specifically alleged that the motive evidence fails to meet the three-part test of *Bell v. Commonwealth,* 875 S.W.2d 882, 889–91 (Ky. 1994), which requires the trial court to balance the relevance, probativeness, and prejudicial effect of the evidence, we recognize that several of his arguments are, in essence, attacks under various prongs of that test. We simply note, however, that the preceding discussion demonstrates that the evidence of Appellant's drug activities met each of the admissibility requirements outlined in *Bell.*

## B. Aggravating Circumstance

Appellant's sentence of life in prison without parole was based on the jury's finding of an aggravating factor under the following statute: "The offender's act of killing was intentional and the victim was a state or local public official or police officer, sheriff, or deputy sheriff engaged at the time of the act in the lawful performance of his duties ...." KRS 532.025(2)(a)(7).[2] The instruction under which the jury found the existence of the

---

**2.** The prosecutor also sought to prove a second aggravator, namely that Appellant was involved in the murder for profit. *See* KRS 532.025(2)(a)(4) (defining the following aggra-

vating factor: "The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit

aggravating factor stated: "The offender's act of Complicity to Murder was intentional and Samuel Wilson Catron was a local public official or sheriff engaged at the time of the act in the lawful performance of his duties." Though Professors Lawson and Fortune have noted that "[t]here is no guidance in the case law on th[is] ... aggravator[ ] and probably none needed," Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 19–7(b)(2), at 692 (1998), the specific facts of this case demonstrate otherwise.

Appellant argues that the instruction as to this aggravating factor should not have been submitted to the jury because the prosecution had not proven that Sheriff Catron was actively engaged in the lawful performance of his duties when he was shot. Appellant also claims that the trial court implied in conference and the prosecutor improperly argued to the jury that the statute contains two separate aggravating factors: where the victim was a public official (without needing to find that he was engaged in the performance of his duties) and where the victim was a sheriff (with the added requirement that he was engaged in the performance of his duties). We address each of Appellant's claims in turn.

### 1. Engaged in the Lawful Performance of his Duties

■ Appellant does not dispute the testimony that Sheriff Catron was in uniform,

had his police radio, and was "on call" on the night he was shot; that he had driven his police cruiser to the fish fry; that he did not work specifically scheduled shifts; or that, when necessary, he had previously performed law enforcement tasks (e.g., traffic control) while attending similar events. Nor does Appellant dispute the prosecution's expert testimony that the sheriff, as a leading law enforcement officer, is always on duty and engages in "community policing" by appearing in his or her official capacity at public events.

Instead, Appellant points to a statement of the trial court which suggests that the court considered submission of the aggravating factor to the jury appropriate because the critical inquiry was whether Sheriff Catron was killed simply because he was the sheriff.[3] Appellant claims that the trial court's decision to allow the jury to consider this aggravating factor, merely because a law enforcement officer has been killed, ignores the plain language of the statute requiring that the officer be "engaged at the time of the act in the lawful performance of his duties" (hereinafter also referred to as the "duty condition").

Appellant's contention that the trial court mischaracterized or misinterpreted the law in Kentucky is correct to the extent that the trial court's rationale for instructing the jury on the aggravator was

---

...."). The prosecutor claimed that because Appellant entered into the murder conspiracy to secure the future of his drug enterprise, he had done so for financial gain. Ultimately, the jury did not find that this aggravating factor was present.

3. The transcript indicates that the trial court specifically stated:

I have given a great deal of thought to this .... Sheriff Catron was in uniform, in his cruiser, at a public function, and the final

question comes down to, at least in my mind, had he not been sheriff would he have been shot. He was there as sheriff. He was not there as an individual, he was there as sheriff. I think part of what he was doing would be considered the lawful performance of his duties and had he not been sheriff at the time, doing what he was doing, he would not have been targeted and would not have been killed.

based solely on the victim's identity as sheriff. Though some states allow the finding of a similar aggravator in broader circumstances, Kentucky is not one of those states. As Professors Lawson and Fortune have noted, the KRS 532.025(2)(a)(7) aggravating factor is "specific and narrow." Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 19–7(b)(2), at 692 (1998). The statute does not require simply that the victim was a law enforcement officer. The qualifying language that follows the identification of the victim requires that the victim was also "engaged at the time of the act in the lawful performance of his duties." We cannot read the statute so broadly as to reduce this requirement to such an extent that an aggravating factor instruction is allowed whenever an offender kills a sheriff or other law enforcement officer.

 That the trial court's statement of the law during the jury instructions conference was partially incorrect, however, does not mean that it was error for the aggravating factor to be submitted to the jury. First, the instruction that was given to the jury properly reflects the law in that it required that the jury find the existence of the duty condition. *See* 1 William S. Cooper, *Kentucky Instructions to Juries (Criminal)* § 12.06 (rev. 4th ed.1999) (offering the follow sample instruction: "The Defendant's act of killing was intentional and _____ (victim) was a state or local public official or police officer, sheriff, or deputy sheriff engaged at the time of the act in the lawful performance of his duties.").

However, Appellant also claims that the factor should apply only when the officer was killed while engaged in a particular task required by law. He argues that the statute's "engaged . . . in the lawful performance of his duties" language would require more than the officer's merely being on duty or being present at a public political event. We find that Appellant's urged reading of the statute is far too narrow.

In interpreting a similar statutory aggravating factor,[4] the Supreme Court of North Carolina noted:

> With regard to the question of whether the officer was engaged in the performance of his official duties when he was murdered, it appears the trial court ruled the officer was not so engaged because he elected to eject the defendants from the premises of the Red Roof Inn instead of making an arrest. We find this to be an unduly narrow and an unrealistically restrictive interpretation of the term "official duties" as it relates in actual practice to law enforcement officers. Such an interpretation would seem to require that a law enforcement officer be actively and aggressively focused upon a particular criminal suspect, as in the case of actually drawing or firing his weapon or engaging in hot pursuit, in order for his public service to fall within the realm of "official duties." We find this to be an inordinately strained and unnatural application of this term as it is normally used with respect to the official duties of all law enforcement officers, which includes such duties as investigative work (in-

---

4. The aggravating factor in question was:

The capital felony was committed against a law-enforcement officer, employee of the Department of Correction, jailer, fireman, judge or justice, former judge or justice, prosecutor or former prosecutor, juror or former juror, or witness or former witness against the defendant, while engaged in the performance of his official duties or because of the exercise of his official duty. N.C. Gen.Stat. § 15A–2000(e)(8).

cluding stakeouts), crowd or traffic control, and routine patrol by automobile. *State v. Gaines,* 332 N.C. 461, 421 S.E.2d 569, 574 (1992). It must be noted that when the officer in *Gaines* was killed, he was privately engaged as a security guard for a hotel. While performing this function, he was still subject to the regulations of the police force and he wore the same uniform and used the same equipment as he would when engaged in his official duties.

We see no reason to read our statute's use of the phrase "lawful performance of ... duties" in a different manner from the phrase "performance of official duties" used in the North Carolina statute. Though the KRS 532.025(2)(a)(7) aggravating circumstance is certainly narrower and more specific than many others in our death penalty statute, the phrase "lawful performance of his duties" encompasses more than just those specific law enforcement tasks required or allowed by law. The statute is intended to allow a jury to find an aggravating factor when a law enforcement officer is murdered while engaged generally in carrying out his or her duties or, said another way, while performing a law enforcement function. This condition is not limited to the performance of specific tasks and duties; it also includes being imminently available to carry out those tasks. A police officer's being "on duty" easily falls within this latter concept.

Unlike the *Gaines* court, we need not address the outer contours of the coverage of the statute because it is clear that sufficient evidence was presented to allow the jury to find that Sheriff Catron was engaged in the performance of his lawful duties because he was performing the core of his law enforcement function. The sheriff is the elected head of the county's law enforcement apparatus, and it is appropriate that he appear in this role at public events. In addition to the specific statutory duties found in KRS 070.010—.273, the sheriff has common law duties, and the choice as to the time and manner of the performance of those duties is often a matter of discretion. This is why several witnesses testified that a county sheriff is always on duty and is likely the reason that Sheriff Catron did not work specifically scheduled shifts.

However, we need not determine today whether a sheriff's constant on-duty status would alone be sufficient to meet the requirements of the statute. While it is likely that the sheriff's attendance at the fish fry was, in part, intended to enhance his public image, thus increasing his chances of re-election, it is also clear that his presence allowed him to maintain a law enforcement presence at a public event. That his presence served a dual purpose, and that he was engaged in a momentary deviation from his official duties in taking a cake to his car, does not disturb this conclusion. We can safely say there was ample evidence that when Sheriff Catron attended public events, like the fish fry, in uniform (and driving his cruiser), he was performing a law enforcement function and was thus "engaged ... in the lawful performance of his duties." Thus, we hold that the evidence as presented at trial was sufficient to support submitting the aggravating factor to the jury.

## 2. Public Official

Appellant's second objection regarding the aggravator is that the trial court's instruction was impermissible in that it implicitly endorsed the prosecutor's argument that KRS 532.025(2)(a)(7) contains two independent aggravating conditions and would apply if the victim is *either* a "state or local public official" *or* a "sheriff or deputy sheriff engaged at the time of the act in the lawful performance of his

duties." It must be noted that the trial court's discussion as to what jury instructions to give during the penalty phase focused primarily on the applicability of the sheriff-engaged-in-the-lawful-performance-of-his-duties portion of the aggravator discussed in the preceding section. However, the prosecutor also urged the trial court to rule that the portion of the statute referring to public officials was also applicable as a separate aggravator, and that it did not require the additional duty condition finding. Although the trial court did not explicitly address this issue, it implied that "public official" was part of a single aggravator under KRS 532.025(2)(a)(7) when after discussing the duty condition it noted, "I also find that there's sufficient evidence to show that he was a local public official, so I'm going to overrule your objection ..., so the two aggravators will be the profit and the sheriff engaged at the time in the lawful performance of his duties."

■ We must first determine whether the "public official" portion of the aggravator would even be applicable where the crime involves the murder of a sheriff. Though we have not expressly held so, we have implied that a sheriff is a public official. *See Grayson County Bd. of Ed. v. Boone*, 452 S.W.2d 371, 373 (Ky.1970) ("No one does or could successfully contend that [the sheriff] received excessive compensation. A public official is entitled to reasonable compensation."). That a sheriff is a constitutional, elected officer, *see* Ky. Const. § 99, further supports the notion that he or she is a public official. Appellant, however, notes that the General Assembly's decision to list both "public official" and "sheriff" in KRS 532.025(2)(a)(7) suggests that the two positions are exclusive of one another, at least for the purposes of the statute. We endeavor to read statutes so as to avoid redundancy. This approach to statutory construction is necessary because the "result [of allowing the redundancy] violates the 'universal rule ... that in construing statutes it must be presumed that the Legislature intended *something* by what it attempted to do.' " *Kentucky Dept. of Corrections v. McCullough*, 123 S.W.3d 130, 140 (Ky.2003) (quoting *Reyes v. Hardin County*, 55 S.W.3d 337, 342 (Ky.2001), in turn quoting *Grieb v. National Bond & Inv. Co.*, 264 Ky. 289, 94 S.W.2d 612, 617 (1936)) (emphasis and omission in original). But, as was the case in *McCullough*, the rule against redundancy appears to be used primarily to limit those redundancies resulting from the enactment of different statutes at different times. Redundancy in a single statute is qualitatively different, especially when it appears as part of a description of the entities to which the statute applies. Such an overlap within a single statute is likely an intentional effort to avoid gaps in the coverage of the statute and does not necessarily indicate that the categories are mutually exclusive. This is the case here, where KRS 532.025(2)(a)(7) includes two broad categories of covered persons: public officials and most law enforcement officers. Therefore, the specific inclusion of "sheriff" in KRS 532.025(2)(a)(7) does not necessarily exclude a person serving in that capacity from also being included in the classification "public official."

■ Whether the duty condition requirement also applies to public officials is a closer question because the statute is ambiguous. KRS 532.025(2)(a)(7) reads as follows:

The offender's act of killing was intentional and the victim was a state *or* local public official *or* police officer, sheriff, *or* deputy sheriff engaged at the time of the act in the lawful performance of his duties ....

(Emphasis added). The statute employs the disjunctive word "or" three times. The first "or" falls between the adjectives "state" and "local," both of which modify the words "public official." Consequently, this first instance of the word "or" has no real effect on the rest of our analysis because it separates only adjectives that modify a single item. The second "or" follows immediately after "public official." This second "or" is followed by a list of three types of law enforcement officers joined by serial commas and the third instance of the word "or." The duty condition immediately follows the list of law enforcement officers. A condition following a series of items joined by the word "or" typically applies to all the items in the series. Thus, it is clear that the condition applies to the entire series of law enforcement officers listed.

The multiple instances of the word "or," however, make it unclear whether the duty condition requirement following the list of law enforcement officials applies only to those individuals or is also meant to apply to the term "public official." As noted above, the third "or" in the statute is used as part of a serial list of persons, all of whom fall within the larger category of law enforcement officials. In fact, the series "police officer, sheriff, or deputy sheriff" might just have easily been represented by a single term (e.g., "peace officers" or "law enforcement officer"). The General Assembly's decision to list only specific officers, however, signals that it intended for the aggravating factor to apply only to a smaller set of officers, where a more expansive term like "peace officer" would cover a far wider variety of individuals. See KRS 446.010(24) (" 'Peace officer' includes sheriffs, constables, coroners, jailers, metropolitan and urban-county government correctional officers, marshals, policemen, and other persons with similar authority to make arrests . . . ."). In light of this understanding, it follows that the second use of the word "or" is used only to distinguish between two categories of people—public officials and a limited class of law enforcement officers—and the duty condition could thus be read to apply to both categories.

In resolving such ambiguity, we must resort to the rules of statutory construction. The statutory command that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature," KRS 446.080(1), is useful here, though it is not ultimately dispositive of the issue. The inclusion of the category public officials could be intended generally to deter politically-motivated assassinations. But it could also be intended to ensure that public officials execute their duties by granting them greater protection while doing so. Had the General Assembly intended the first option, it is likely that it would have listed the intentional killing of a public official as a distinct aggravating factor in a separate subsection of the statute. That public officials and various law enforcement officers are listed in the same subsection supports the conclusion that the General Assembly intended the duty condition requirement to be applicable to both groups.

▮▮▮▮ Most convincing, however, is the proposition that when "[i]t is not possible to determine which meaning the General Assembly intended . . . the movant is entitled to the benefit of the ambiguity." *Haymon v. Commonwealth,* 657 S.W.2d 239, 240 (Ky.1983); *see also Commonwealth. v. Colonial Stores, Inc.,* 350 S.W.2d 465, 467 (Ky.1961) ("Doubts in the construction of a penal statute will be resolved in favor of lenity and against a construction that would produce extremely harsh or incongruous results or impose punish-

ments totally disproportionate to the gravity of the offense ....”); *Atlantic Coast Line R. Co. v. Commonwealth,* 302 Ky. 36, 53, 193 S.W.2d 749, 758 (1946) (“[A] legislative intent not clearly revealed may be presumed to hold in contemplation the reasonable and probable. If something else was in view, it should not have been left to implication. There will be no assumption of a purpose to visit oppression.”). Application of the duty condition requirement to the intentional killing of public officials would elevate the measure of evidence required to prove the aggravating factor under KRS 532.025(2)(a)(7). The rule of lenity requires any ambiguity in a statute to be resolved in favor of a criminal defendant. Therefore we must conclude that the duty condition requirement must be proved in order for the jury to find an aggravating factor rising from the murder of a public official under KRS 532.025(2)(a)(7).

The trial court's instruction was correct under this interpretation of the statute and read as follows:

> The offender's act of Complicity to Murder was intentional and Samuel Wilson Catron was a local public official *or* sheriff engaged at the time of the act in the lawful performance of his duties.

(Emphasis added). It joined two nouns—“public official” and “sheriff”—with the word “or.” These terms were followed by the duty condition requirement, in a single grammatical construction. As noted above, the common understanding of such an English language construction, with a single instance of the word “or,” is that the duty condition applies to both “public official” and “sheriff.”

██ The trial court's instruction, which allowed the jurors to find that Sheriff Catron was either a public official or a sheriff, presents the potential for a unanimous verdict problem. *See Davis v. Common-*

*wealth,* 967 S.W.2d 574, 582 (Ky.1998) (“Nothing less than a unanimous verdict is permitted in a criminal case. Unanimity becomes an issue when the jury is instructed that it can find the defendant guilty under either of two theories, since some jurors might find guilt under one theory, while others might find guilt under another.” (citations omitted)). Though Appellant has not raised this specific issue, we address it nonetheless because it is easily resolved and because the failure to raise it likely stems from the fact that the issue is only apparent in light of our resolution of the statute's ambiguous language. We have posited a simple test for evaluating possibly non-unanimous verdicts: “If the evidence would support conviction under both theories, the requirement of unanimity is satisfied. However, if the evidence would support a conviction under only one of two alternative theories, the requirement of unanimity is violated.” *Id.* (citations omitted). Because there was ample evidence to support both the finding that Sheriff Catron was either a public official or a sheriff, or both, there was no issue as to unanimity of the verdict.

██ Somewhat more troubling is the fact that the prosecutor spent a significant portion of his closing argument incorrectly arguing that Sheriff Catron's status as a public official was a separate aggravator and that the jury need not find the existence of the duty condition if it concluded that Sheriff Catron was, indeed, a public official. Although Appellant had objected to this interpretation of the law during the conference on the penalty phase jury instructions, this claim simply was not preserved because Appellant did not object to the prosecutor's closing argument. And, as noted above, the trial court clearly contemplated that the instruction in question presented a single aggravating factor. Though it is possible Appellant's failure to

object to the prosecutor's closing argument was the result of a misunderstanding of the trial court's inclusion of the "public official" language in its instruction, we cannot say that this is sufficient to preserve the error. Having failed to register any objection, Appellant may not retrospectively benefit from this error.

## C. Failure to Give Pre–Trial Notice of Evidence of Aggravating Circumstances

██ Appellant's next claim is that the trial court erred by allowing the prosecutor to introduce evidence of aggravating factors for which proper notice had not been given as required by KRS 532.025(1)(a). Approximately two years prior to trial, the prosecutor notified Appellant of his intent to seek the death penalty. The notice also included the aggravating factors the prosecutor intended to prove to justify the death penalty. In addition, Appellant was given a list of the prosecutor's potential penalty-phase witnesses. This list was supplemented by the curricula vitae of several of the witnesses and the results of a questionnaire filled out by one witness. Appellant claims that these disclosures were insufficient under the statute, which allows "that only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible" during the penalty phase. KRS 532.025(1)(a).

We have previously held that "[t]his notice requirement is satisfied by timely filing a formal notice of intent to seek the death penalty and the aggravating circumstances upon which the Commonwealth intends to rely." *Soto v. Commonwealth,* 139 S.W.3d 827, 843 (Ky.2004). The pretrial notice of the prosecutor's intent to seek the death penalty and the aggravating factors to be relied upon were sufficient notice of the evidence in aggravation as discussed in *Soto.* That Appellant received additional information pertaining to the evidence which the prosecutor intended to introduce further undermines this claim of error.

## D. Denial of Continuance

██ Appellant's trial was originally set for September 3, 2003. On August 11, 2003, Appellant served the prosecutor with notice of his intent to introduce evidence of mental illness or insanity at trial. At the prosecutor's request, the trial court ordered that Appellant be evaluated at the Kentucky Correctional Psychiatric Center (KCPC) to determine if he was competent to stand trial, was insane, suffered from mental illness, or was mentally retarded. Because this evaluation could not be completed before his scheduled trial date, the trial was continued to November 3, 2003.

The trial court held a competency hearing on October 24, 2003. One of the psychologists who had examined Appellant at KCPC testified that Appellant had received a score of 78 on an IQ test administered in 1992 and a score of 68 on an IQ test administered at KCPC. The psychologist stated that the 1992 test score was slightly high due to the so-called "Flynn effect,"[5] but he also stated that Appellant's low IQ score on the test given by KCPC was a result of malingering. After hearing this testimony, the trial court held that Appellant was competent to stand tri-

---

5. Though the psychologist in this case did not go into detail about the "Flynn effect" or its exact application to Appellant's IQ scores, we note our discussion of the phenomenon in *Bowling v. Commonwealth,* 163 S.W.3d 361 (Ky.2005). In that case, we described the Flynn effect as "a finding ... that as time passes and IQ test norms grow older, the mean IQ score tested by the same norm will increase by approximately three points per decade." *Id.* at 375. The 78 score was on a test administered in 1992.

al. Appellant immediately moved for a continuance to seek further evidence of his IQ in order to determine if he was mentally retarded and thus ineligible for the death penalty.[6] The court expressed concern that Appellant's IQ might be within the range that would possibly bar the death penalty, but nonetheless denied the motion for a continuance, noting that there was evidence that the difficulty with the test administered by KCPC had been caused by Appellant and that the ten days remaining until the trial date provided sufficient time to arrange for another IQ test.

On the second day of trial, Appellant again moved for a continuance. He claimed that he had been unable to arrange to take another IQ test in the allotted time and that the psychologists he had contacted could not schedule such a test for at least several months. He also noted that his adult daughter had died suddenly a few days before and that as a result he could not effectively assist his attorney in the jury selection process. As to Appellant's inability to arrange the IQ test, the court noted:

> The indications are that Mr. White did not cooperate sufficiently with the IQ test to have a valid reading. The Court has the information that this IQ is 78. Then after we got the report back, there was additional time given to the defendant to make an additional determination and, of course, that was not accommodated. The court is of the opinion that in part the reason it was not accommodated was that the report that you have shows that he was not giving his best effort to cooperate with counsel. For that reason, the court finds that his IQ is over 70.

As to Appellant's ability to assist his attorney in light of his then recent loss, the court scheduled the court to begin late the next day so he would have time to spend with his family. The court then noted: "Mr. White will be able to assist in his defense. The Court feels comfortable he was... The Court had an opportunity to observe him and I understand the circumstances and I have sympathy for him. However, it is my feeling that we must go forward." With this in mind, the trial court denied the motion for a continuance.

Appellant now claims that it was error for the trial court to deny his motion for a continuance for more time to investigate his IQ and its effect on any defenses he might have raised. We begin by noting that because Appellant did not receive the death penalty, the question of his IQ (and whether he was retarded) is significantly less relevant because KRS 532.134—.140 were inapplicable. However, because Appellant's alleged low intelligence was relevant as a mitigating factor related to the sentence he did receive, we address his claim.

Appellant cites *Pendleton v. Commonwealth*, 83 S.W.3d 522 (Ky.2002), for the proposition that his receipt of the KCPC report on the morning of the competency hearing was a denial of due process. In *Pendleton*, we held that it was a denial of due process when a defendant received a sex offender assessment report on the day before he was to be sentenced, thus giving his attorney inadequate time to review the contents of the document. But *Pendleton* is limited to its specific circumstances as a case involving the late receipt of a sex offender assessment report, a document that directly affects the defendant's classification as a sex offender at sentencing.

---

**6.** An offender who is mentally retarded, as defined in KRS 532.135, is not subject to the death penalty. KRS 532.140. KRS 532.135 requires that a defendant have an IQ of 70 or below to be classified as mentally retarded.

The competency report Appellant received from KCPC had no such direct effect on his sentence. Nor could it even have been considered conclusive given that the trial court allowed Appellant to seek an additional IQ test after the competency hearing was held. This extra time alleviated any prejudice that Appellant might have suffered from receiving the KCPC report the morning of the competency hearing. That Appellant's IQ could not be tested again before trial did not raise the late delivery of the KCPC report to the level of a due process violation.

■ Appellant also cites *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and *Hunter v. Commonwealth*, 869 S.W.2d 719 (Ky.1994), for the proposition that it is a denial of due process under federal and state law to deny a defendant in a capital case a continuance so that he may undergo a full psychological examination. In *Ake*, the Supreme Court reversed a conviction where the trial court had refused to require the state to provide defendant the assistance of a psychiatrist. We must note that the Court's opinion in *Ake* expressly addresses only the broader issue of the defendant's sanity and that its application in another area, such as an IQ test, is by analogy. That being said, the Supreme Court stated its holding succinctly: "[W]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74, 105 S.Ct. at 1091–92. Appellant meets neither of the specific requirements that the Court imposed in *Ake*. He has not claimed, much less shown, that he was indigent at the time of trial.[7] And given that the trial court found that Appellant's IQ was over 70 and that the difficulties with his test at KCPC were his own fault, it was unlikely that Appellant's intelligence was going to be a significant factor at trial. More importantly, Appellant was never denied access to a psychiatrist. In fact, he *was* fully evaluated, at KCPC, at the state's expense, and KCPC's findings were that he was competent, sane, and not mentally retarded. Even assuming that *Ake* is applicable to the narrow question of determining a defendant's IQ, it is clearly inapplicable to the facts at hand.

The state law claim in *Hunter* was based on a finding that the trial court abused its discretion in denying a continuance under *Snodgrass v. Commonwealth*, 814 S.W.2d 579 (Ky.1991), *overruled in part on other grounds by Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky.2001). *Snodgrass* requires that the trial court evaluate the request for a continuance using a seven-factor balancing test:

> Whether a continuance is appropriate in a particular case depends upon the unique facts and circumstances of that case. Factors the trial court is to consider in exercising its discretion are: length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the

7. Admittedly, we cannot find in the record conclusive evidence that Appellant hired his trial attorney. But neither can we find evidence that Appellant's attorney was appointed by the trial court. There is an affidavit of indigency and a resultant finding that Appellant was indigent in the record, but neither was filed until after Appellant was convicted and sentenced, and both relate to Appellant's request that an attorney be appointed for his *appeal*. In fact, Appellant's affidavit of indigency implies that his trial attorney was hired since it states that Appellant's post-trial indigency arose because he depleted his assets defending the charges against him at trial.

accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice.

*Id.* at 581. Though the trial court did not engage in an explicit discussion of the *Snodgrass* factors and we accord the decision to deny the continuance a great deal of deference, *see id.* ("The decision to delay trial rests solely within the court's discretion."), it is necessary that we engage at least in a cursory examination of those factors.

The first factor weighs neither for nor against Appellant. While the length of delay that would be required by the requested continuance was not substantial, it was also not insignificant. The psychologists Appellant had contacted required at least one to two months before they could evaluate him. It is unclear how long of a delay Appellant was requesting so that he could deal with the grief over the death of his daughter.

The second factor, previous continuances, weighs somewhat in favor of Appellant since he had not previously requested one. However, though the one previous continuance had been granted at the prosecutor's request, it was made in response to Appellant's notice of his intent to introduce evidence of mental illness or insanity. While we do not agree with the Commonwealth that this weighs completely against Appellant, it is at least relevant in that it militates against weighing this ' factor heavily in favor of Appellant. As we have previously noted in discussing this factor, "[w]hile there is certainly no prescribed length of time in which a capital trial should take place in order to ensure fairness, a trial court has the authority as well as the duty to proceed in a manner that allows for reasonable development and presentation of relevant evidence." *Hunter*, 869 S.W.2d at 725 (footnote omitted).

Appellant's indictment had been pending for approximately sixteen months when he requested the continuance. During that period, he had had ample time to investigate possible mental illness defenses, yet he waited until the month before trial was originally scheduled to give the prosecutor notice of his intent to pursue such a defense.

The third factor, inconvenience to the litigants, witnesses, counsel, and the court, is more complex. Appellant's first request for a continuance likely would not have caused much more than administrative inconvenience because it was made a full ten days before the trial was scheduled to begin. Appellant's second request, however, coming on the second day of jury selection, posed a major inconvenience to the court. The jury pool had already been established and the court had begun the complex task of vetting jurors for consideration of a capital indictment. Furthermore, the trial court had already agreed to some inconvenience by allowing Appellant half of the third day of jury selection to spend time with his family.

The fourth factor, whether the delay is purposeful or was caused by the accused, weighs against Appellant. It is true that Appellant had no hand in his daughter's unexpected death, but ultimately this was not a compelling reason to grant a continuance. It is clear, however, that Appellant's malingering when he took the IQ test administered by KCPC, a fact that the trial court relied on heavily in denying the continuance, was a large part of the cause of the requested delay. Had Appellant not intentionally performed poorly on the IQ test, it is likely that his intelligence would have been, at most, a minor issue.

The fifth factor, availability of other competent counsel factor, is not at issue in this case.

The sixth factor, complexity of the case, is closer to neutral than it would appear at first glance, given that this was a capital case. The requested delay was not because Appellant's attorney had been afforded insufficient time to prepare a complex death penalty case. Rather, he requested the continuance primarily to facilitate the administration of a second IQ test. As noted above, Appellant's attorney had well over a year to prepare for trial and there was no indication that additional time was needed. Therefore, this factor was a non-issue.

The final factor, whether denying the continuance will lead to identifiable prejudice, weighs heavily against Appellant. The trial court actually made a finding on the record that Appellant's IQ was over 70, thus removing him from the coverage of KRS 532.140. This finding was supported by substantial evidence in the form of the 78 score on the 1992 IQ test[8] and testimony that his score of 68 on the KCPC IQ test was the result of intentional malingering. We have no basis to conclude this ruling was erroneous and see no prejudice stemming from it. Appellant claims that he could have presented proof of his allegedly low IQ as evidence in mitigation. However, any prejudice related to this claim is quite speculative, especially since Appellant actually presented the 78 and 68 IQ test scores as evidence of his low intelligence. With regard to the death of Appellant's daughter, we simply reiterate that the trial court noted that it had observed Appellant assisting in the jury selection process and saw that he was having little difficulty. Thus, we can identify no prejudice related to the death of Appellant's daughter.

After considering these factors, particularly Appellant's role in creating the delay and the lack of any identifiable prejudice, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for a continuance.

### E. Failure to Instruct on Facilitation

 Finally, Appellant alleges that he was improperly denied an instruction on facilitation as a lesser-included offense of complicity to the murder of Sheriff Catron. The statute criminalizing complicity reads in relevant part:

A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense . . . .

KRS 502.020(1). Similarly, the facilitation statute reads:

A person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

KRS 506.080(1). Our distinction between the applicability of the two statutes depends on the defendant's mental state:

Under either statute, the defendant acts with knowledge that the principal actor is committing or intends to commit a crime. Under the complicity statute, the defendant must intend that the crime be committed; under the facilitation statute, the defendant acts

---

8. Even if the Flynn effect, as discussed in footnote 5 above, were doubled, Appellant's score on his 1992 IQ test would have been more than 70.

without such intent. Facilitation only requires provision of the means or opportunity to commit a crime, while complicity requires solicitation, conspiracy, or some form of assistance. Facilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime.

*Thompkins v. Commonwealth,* 54 S.W.3d 147, 150 (Ky.2001). An instruction on facilitation as a lesser-included offense of complicity "is appropriate if and only if on the given evidence a reasonable juror could entertain reasonable doubt of the defendant's guilt of the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense." *Skinner v. Commonwealth,* 864 S.W.2d 290, 298 (Ky.1993).

Appellant claims that his situation is similar to that discussed in *Webb v. Commonwealth,* 904 S.W.2d 226 (Ky.1995), where the defendant claimed that, while driving his girlfriend to various locations, he discovered that she was engaged in a series of drug transactions and that he continued to drive her even after he knew she possessed illegal drugs. We held that "[i]n light of this evidence, a reasonable juror could believe that appellant gave [his girlfriend] a ride in his car, knowing that she was in the process of a drug transaction, but that appellant did not specifically intend that that crime be accomplished." *Id.* at 229. When there are competing versions of the events, "[t]he decision as to whose story to believe is, of course, an issue for the jury to decide." *Id.*

Appellant argues that like the defendant in *Webb* he was entitled to the facilitation instruction because it was possible that the jury could have believed he provided Shelley with the "means and opportunity" to murder Sheriff Catron and that he knew Shelley was going to kill Sheriff Catron, but that he did not intend for Shelley to commit the murder. He claims that the jury could have believed the testimony of Shelley and Morris that he helped Shelley procure and prepare the getaway motorcycle, he bought the shells used in the murder, and that he suggested the place from which Shelley did the shooting, but might not have believed their testimony that he was an active participant in planning the murder.

While "we have held that the jury may believe all of testimony of either or any one of witnesses in whole or in part," *Cheatham v. Chabal,* 301 Ky. 616, 619, 192 S.W.2d 812, 814 (1946), we also have held that "[a]n instruction on a lesser included offense requiring a different mental state from the primary offense is unwarranted unless there is evidence supporting the existence of both mental states." *Taylor v. Commonwealth,* 995 S.W.2d 355, 362 (Ky.1999). That the jury could have disbelieved part of the testimony of Shelley and Morris does not constitute evidence of the lesser mental state required for a facilitation instruction. Rather, such disbelief would support a finding that Appellant was innocent, especially since the only other proof as to Appellant's mental state was his own testimony that he had nothing to do with the crime and was merely present when the various tools used in the shooting were obtained.

Appellant's theory would require the jury to split the difference between his testimony and that of Morris and Shelly to find the existence of a mental state for which there was no affirmative evidence. Such an approach would require that a facilitation instruction be given in every case where the defendant is charged with complicity. But such an approach is improper and a lesser-included offense instruction is available only when supported by the evidence. The evidence presented at trial supported only two theories: that

Appellant was an active participant in planning the crime and intended that it be carried out, or that he was an innocent bystander who happened to be present when some of the instruments used in the crime were acquired. There was no evidence of a middle-ground violation of the facilitation statute. "The jury is required to decide a criminal case on the evidence as presented or reasonably deducible therefrom, not on imaginary scenarios." *Thompkins*, 54 S.W.3d at 151. Therefore, we conclude that the trial court was correct in refusing Appellant's request for a facilitation instruction.

## IV. CONCLUSION

Because we find no error, the judgment of the Pulaski Circuit Court is affirmed.

All concur.