RENDERED: SEPTEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0108-MR

LANDON STINSON                                   APPELLANT

v.
               ON APPEAL FROM TRIGG CIRCUIT COURT
               HONORABLE NATALIE WHITE, JUDGE
               NO. 21-CR-00149

COMMONWEALTH OF KENTUCKY                       APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Following an eight-day trial, a Trigg County jury found Landon Stinson guilty of two counts of murder. He was sentenced to life imprisonment without the possibility of parole. Stinson now appeals as a matter of right and challenges his convictions. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Trigg Circuit Court.

## I. BACKGROUND

Appellant Landon Stinson often spent time with his cousin, Matthew Blakely, at the home of Stinson's aunt, Sue Farris. Through the years, Stinson resided intermittently with Sue and had occupied a bedroom at her home. In June or July 2021, Stinson moved into his own apartment. On July 2, 2021, when Matthew's wife, Bobbi Jo, had not heard from Matthew, she drove by

Sue's home and saw Matthew's vehicle in the driveway. Bobbi Jo assumed that her husband was either inside the home or with Stinson. After neither Bobbi Jo nor Mary Hargrove, Matthew's sister, had heard from Matthew by the following morning, Bobbi Jo and Mary returned to Sue's home. Mary called Sue's phone and could hear it ring from inside the home, but no one answered. Mary then contacted Sue's niece, Kathy Farris, and Kathy brought a key over to Sue's home. The three entered the home. Inside, Matthew was observed slumped over in a chair and Sue was lying on the floor in a pool of blood. Both appeared dead. Bobbi Jo, Mary, and Kathy exited the home, and Kathy called 911.

Responding officers confirmed that Matthew and Sue were deceased. An autopsy later confirmed that Matthew was shot three times, twice in the chest and once in the head. Sue was shot once in the head. Law enforcement began collecting evidence. Kentucky State Police Detective Brian Hill discovered multiple spent Hornady 9mm casings and projectiles which were later determined to have been fired from a Smith & Wesson handgun. Inside of the bedroom previously occupied by Stinson, detectives found a 9mm Smith & Wesson magazine and a plastic bag with cocaine residue. Detective Hill searched Matthew's truck but collected no evidence from it. Detective Sergeant David Dick assisted the other officers in processing the scene. He noted that Sue's purse and Matthew's wallet were untouched and that there were no signs of robbery. A can of Dr. Pepper located at the scene was later determined to have Stinson's DNA on it.

2

Stinson was not present at the scene nor was he able to be contacted by his family members. His family members feared that he had also been victimized. In an attempt to locate Stinson, Sergeant Dick contacted Stinson's employer, sent a deputy sheriff to Stinson's home, and attempted to obtain a "ping" of Stinson's cell phone location, all to no avail. Detective Hill and Sergeant Dick accompanied Stinson's mother, Rhonda Neighbors, and her husband to Stinson's apartment in hopes of finding Stinson. They did not find Stinson there. Instead, Rhonda advised the officers that she saw a broken cell phone she believed to belong to Stinson in the wood line near the property. The officers retrieved the phone, along with a container holding a glass pipe with drug residue and other drug paraphernalia, in the wood line. After obtaining a search warrant for Stinson's apartment, officers found two empty 9mm Smith & Wesson handgun boxes along with a fully intact Hornady 9mm cartridge inside the apartment. Officers also found another broken cell phone inside a trash can.

After adding a description of Stinson's vehicle and license plate number to the National License Plate Reader Program, Sergeant Dick learned that a license plate reader had captured Stinson's vehicle near Amarillo, Texas, on 8:12 a.m. on July 3, 2021. The following day, on July 4, 2021, Stinson contacted his mother, Rhonda, using a new cell phone number. Using this new number, Sergeant Dick sought a "ping" for the location of the new phone and learned that the phone was in California. Sergeant Dick also learned that Stinson had nearly drained his bank account prior to leaving Kentucky.

3

Sergeant Dick obtained a warrant for Stinson for drug related charges based on the evidence of drug use found in Sue's home.

On July 5, 2021, California Highway Patrol observed a person later determined to be Stinson walking along the freeway in Los Angeles. Because walking along the freeway is illegal in California, the officer stopped and handcuffed Stinson, put Stinson inside his patrol vehicle, and went to the next exit to drop Stinson off. Stinson originally told the officer his name was Reece but later admitted that his real name was Landon Stinson. Stinson did not have a phone, car keys, identification, or wallet with him. He claimed that he had driven to California a few days prior for work, but that his truck had run out of gas some distance away from where he was picked up by police. After the officer learned that Stinson had a warrant for drug charges and was wanted for questioning in a double homicide case in Kentucky, arrangements were made for Sergeant Dick and Detective Hill to fly to Los Angeles to question Stinson and extradite him back to Kentucky for the drug charge.

Once in Los Angeles, Sergeant Dick read Stinson his *Miranda*[1] rights and began questioning Stinson about the drugs and drug paraphernalia found in Sue's home. The officers then informed Stinson that Sue and Matthew were found dead in the home and had been shot to death. Soon thereafter, Stinson stated, "I think it would probably be safe for me to have a lawyer. I kind of see where this is going." The questioning continued until Stinson stated, "I would

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

really want to talk to a lawyer, at this point." The officers concluded the interrogation at this point.

On December 14, 2021, Stinson was indicted by the Trigg County Grand Jury for two counts of capital murder. Pretrial motion practice included motions in limine in which Stinson sought to exclude KRE[2] 404(b) evidence and statements made to officers in Los Angeles following his first mention of obtaining counsel. After hearings on the motions, the trial court ruled that all disputed 404(b) evidence and the contested statements may come in at trial.

Because the Commonwealth sought the death penalty in this case, RCr[3] 9.38 mandated the jurors be subjected to individual voir dire out of the presence of other prospective jurors. During the voir dire process, the trial court denied three motions from Stinson to exclude jurors for cause. The case proceeded to trial, where Stinson twice alleged that Sergeant Dick was demonstrably reactive to statements made by witnesses with whom he disagreed, and that his actions may have influenced the jury. Both times, the trial court instructed the Commonwealth to reign in Sergeant Dick, but the trial court's ability to observe his actions for itself was blocked by a lamp.

Following an eight-day trial, the jury found Stinson guilty of two counts of intentional murder and recommended a sentence of life without the possibility of parole. Stinson moved for a new trial, and his motion was heard on January 3, 2024. The trial court ultimately denied Stinson's motion and

---

[2] Kentucky Rules of Evidence.

[3] Kentucky Rules of Criminal Procedure.

Stinson was sentenced in accordance with the jury's recommendation. This appeal followed.

Additional facts will be developed below as necessary.

## II. ANALYSIS

On appeal to this Court, Stinson alleges the trial court made various errors which require reversal. First, he alleges that the trial court erred when it refused to strike three jurors for cause. Second, he alleges that the trial court erred in allowing improper KRE 404(b) evidence to be admitted. Third, he alleges that he invoked his right to counsel and was ignored. Fourth, he alleges that Sergeant Dick physically demonstrated either his approval or disapproval of witness testimony and defense's closing arguments while seated with the Commonwealth at counsel table. Last, he argues that this Court should reverse for cumulative error. Each of Stinson's arguments will be addressed in turn.

### A. The trial court did not err when it failed to strike three jurors for cause.

Stinson alleges that the trial court's failure to grant Stinson's motion to strike Jurors Harper, Page, and Wright for cause, forcing Stinson to use his peremptory strikes on these three jurors instead of striking three other jurors who each ultimately served as the final twelve jurors, amounted to reversible error. Stinson's counsel preserved the issue in compliance with *Floyd v. Neal*, 590 S.W.3d 245, 252 (Ky. 2019), by identifying on the strike sheet those jurors counsel would have struck instead had Jurors Harper, Page, and Wright been struck by the trial court and submitting the strike sheet to the trial court prior

6

to the jury being empaneled. All three jurors that Stinson's counsel would have struck ended up serving on the jury.

"[W]hether to excuse a juror for cause rests upon the sound discretion of the trial court and on appellate review, we will not reverse the trial court's determination 'unless the action of the trial court is an abuse of discretion or is clearly erroneous.'" *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 192 (Ky. 2017).

> RCr 9.36(1) plainly and succinctly establishes the standard by which trial courts are to decide whether a juror must be excused for cause. The rule says: "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." Rule 9.36(1) is the only standard for determining whether a juror should be stricken for cause.

*Id.* at 193 (citing *Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013)). "The central inquiry is whether a prospective juror can conform his or her views to the requirements of the law, and render a fair and impartial verdict based solely on the evidence presented at trial." *Wood v. Commonwealth*, 178 S.W.3d 500, 516 (Ky. 2005). Trial courts are deserving of deference because they are in the best position to "observe the demeanor of the prospective jurors and understand the substance of their answers to voir dire questions." *St. Clair v. Commonwealth*, 140 S.W.3d 510, 535 (Ky. 2004) (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 797 (Ky. 2001)).

> Doubts about a prospective juror's ability to "render a fair and impartial verdict on the evidence" can arise for a host of reasons, but they often arise from a juror's having prejudged the defendant based on information, or supposed information, acquired outside of court; or from the juror's having some personal reason, such as a

7

relationship with a trial participant or personal experience of a crime like the one alleged, to lean one way or the other.

*Futrell v. Commonwealth*, 471 S.W.3d 258, 272 (Ky. 2015).

**Juror Harper**

At the beginning of voir dire, Juror Harper did not respond when the trial court asked a pool of jurors containing Juror Harper whether sitting for a two-week trial would pose a potential hardship on anyone for reasons such as doctor appointments, health problems, or other prior commitments which could not be rescheduled. However, on her juror questionnaire form, Juror Harper indicated that she has diverticulitis, a health condition which might make it difficult for her to sit for the trial without frequent breaks. When Juror Harper was questioned during individual voir dire, she stated that her condition causes her to go to the bathroom between two and six times within the first four hours of the morning. She described this condition as "problematic." When asked whether it could disrupt her ability to sit on the jury, she stated that she was "afraid so," but that she "didn't go as far as to get a doctor's note or anything like that for it."

Juror Harper also indicated that she was familiar with the prosecutor from a case the prosecutor had prosecuted fourteen years prior involving spousal abuse against Juror Harper's daughter. She commented that the prosecutor "did a great job and made sure he stayed in prison longer." Juror Harper stated that she was not aware of which county it was prosecuted in, as her husband and daughter handled it while she stayed home and babysat. When she was asked whether anything about that case would affect her ability

8

to sit in the jury pool and just listen to the evidence presented, Juror Harper replied, "no."

Stinson moved to strike Juror Harper due to her health condition. The prosecutor suggested that taking breaks once an hour would accommodate her condition, while counsel for Stinson maintained that breaks would be insufficient given the urgency of the condition. Counsel for Stinson explained that "it's something that hits you real soon . . . just hits you instantly. You got to go within the next three or four minutes or there's going to be a real problem." The trial court questioned why, if the condition was so problematic, the juror did not indicate so earlier when originally questioned about medical hardships. Ultimately, the trial court declined Stinson's motion to strike Juror Harper for cause, stating, "I believe I'm going to keep her in. I think if it was that serious of a condition, she would have said something earlier. I think I've given a lot of time for her to do that. I think I'm going to keep her in the original pool."

On appeal, Stinson argues that the failure to strike Juror Harper was error because "she would be more worried about her diverticulitis and having to use the bathroom many times in the morning than rendering a fair and impartial verdict." Stinson acknowledges that the trial court believed that the condition must not have been serious, given that the juror had not mentioned it at an earlier time despite opportunities to do so, but argues that the trial court made no effort to discern whether hourly breaks would have been sufficient to accommodate Juror Harper's condition. Stinson also now argues

on appeal that the trial court should have struck Juror Harper for apparent bias based on her comment that the prosecutor "did a great job" in the case involving her daughter.

Stinson's arguments fail. While Juror Harper's medical condition may have made it difficult for Juror Harper to sit for the trial and may have been an inconvenience to the trial court, there is no evidence that her condition would have caused her to be biased toward either party or that it would have compromised her ability to listen to and understand the evidence presented. At most, Juror Harper's condition would have forced the court to take more frequent breaks, perhaps at short notice, but a trial court willing to accommodate these breaks would certainly be no bar to affording the defendant a right to a jury composed of a fair cross-section of the community. *See Meece v. Commonwealth*, 348 S.W.3d 627, 697 (Ky. 2011) (discussing a judge's power to control the progress and shape of trial); *Miller v. Commonwealth*, 394 S.W.3d 402, 409 (Ky. 2011) ("The Sixth Amendment right to a jury trial includes the right to a petit jury selected from a representative cross-section of the community."). There is no indication that Juror Harper's condition would have caused her to unfairly align with or against either Stinson or the Commonwealth, or that taking more frequent breaks would have limited her ability to objectively and carefully weigh the evidence. In short, Stinson would not have been prejudiced by Juror Harper's health condition.

Further, Juror Harper's familiarity with the prosecutor's involvement in a prior case concerning the juror's daughter was not adequate reason to find

10

error with the trial court's decision to keep Juror Harper in the jury pool. In *Cochran v. Commonwealth,* 114 S.W.3d 837, 840 (Ky. 2003), this Court found no abuse of discretion where the trial court declined to strike a juror who had been a victim in another case handled by the same Commonwealth's Attorney, but where the juror only spoke with the Commonwealth's Attorney a couple of times in connection with the case because the juror worked mainly with a victim's advocate and where the juror stated that she could put her past dealings with the Commonwealth's Attorney aside and be fair and impartial.

Here, the relationship between Juror Harper and the prosecutor is even more attenuated. Juror Harper was not the victim in a case handled by the prosecutor; instead, she was the victim's mother. Juror Harper did not observe the proceedings. Instead, she stayed home and let her husband and daughter handle the matter and was not even aware of the county in which the case was brought. The case involving Juror Harper's daughter was fourteen years prior to the trial of this case. There was no suggestion that Juror Harper had ever spoken with the prosecutor in this case, but merely that she recognized that the prosecutor involved in her daughter's case was the same prosecutor involved in the case at hand. Juror Harper stated unequivocally that nothing about the prior case would affect her ability to sit "in this jury pool and just listen to the evidence that comes from the witness stand." In light of our holding in *Cochran,* and the more attenuated relationship at issue here, there is nothing here that should convince us to find an abuse of discretion in the trial court's failure to strike Juror Harper.

11

**Juror Page**

Juror Page is a teacher at a public high school. She had served on a prior jury for a case involving a criminal defendant that was ultimately acquitted of misdemeanor marijuana charges. She was asked about her experience serving on this jury:

> **Commonwealth**: Anything about that experience serving on that jury trial that you think would interfere with you sitting in this jury if you were picked?
>
> **Juror Page**: Well, it didn't really go well for me after that. I had a student in my class whose father was a sheriff in that jurisdiction, and the kid asked me the next day, "why did you let him go?" And I said, "it wasn't me; it was the whole jury." I felt very threatened by that, so I didn't drive through that area very often.
>
> **Commonwealth**: So that was not a good experience?
>
> **Juror Page**: No. No, not at all. No, not at all.
>
> **Commonwealth**: And does that cause you pause in being picked as a juror?
>
> **Juror Page**: A little bit. A little bit.

Juror Page then disclosed that she currently has the prosecutor's child in class and had previously taught another child of the prosecutor. Juror Page indicated that she had never interacted with or been introduced to the prosecutor but had probably emailed her. When asked if there was anything else that might interfere with her ability to sit as a juror and listen to the evidence that is presented in the courtroom, Juror Page expressed concern about being away from her job for two weeks. She stated that she taught half of the students in the high school and that their education would suffer if she were absent for two weeks.

12

Counsel for Stinson asked Juror Page several follow-up questions. First, he asked her if potentially serving as a juror in this case would make her uncomfortable given her previous experience serving on a jury. She stated, "No, I'd just, I miss my kids. I teach a hundred and sixty kids every day, and I just miss each one of them. That's all." He then asked her if the fact that she would miss her students would play on her mind some if she were to sit for the rest of the trial, to which she responded, "not really, but maybe a little bit, not really though." He asked whether it would interfere with her ability to sit and listen to whatever goes on in the courtroom, to which she responded, "No, I could do it, but I'd still miss them, yeah. A little bit I guess." He then asked whether having the prosecutor's child in her class would make her uncomfortable to return a "not guilty" verdict if she felt that is what she should do, knowing that would be against the prosecutor's wishes. Juror Page responded, "No, it'd be alright, that would be fine. I mean, I would just have to do my service."

Counsel for Stinson then moved to strike Juror Page for cause "because of the position she's in with [the prosecutor]'s child, based on that and her previous experience, the fact that she's teaching one hundred and sixty students and she'd rather be there, and someone is having to fill in for her." The prosecutor responded by saying that Juror Page has demonstrated that she can be fair and base her decision on the evidence presented in the courtroom, and that neither she (the prosecutor) nor Juror Page recall ever having interacted with each other. The trial court declined to strike Juror

Page, stating that nothing Juror Page said rose to the level of excusing her for cause from the jury pool.

On appeal, Stinson argues that the trial court abused its discretion by failing to strike Juror Page. In support, Stinson argues that Juror Page's past bad experience with serving on a jury in which she was questioned by a student whose father was a sheriff, particularly in light of the fact that Juror Page now teaches the prosecutor's child, warranted a for-cause strike. Specifically, Stinson states that, "Her fear of retribution if the jury were to find a defendant not guilty was an explicit statement that she could not be impartial." Additionally, Stinson argues that a for-cause strike was warranted because Juror Page "unequivocally stated that being away from her kids for two weeks would interfere with her sitting as a juror 'a little bit.'"

Particularly in cases where a trial court is making inferences about a juror's ability and willingness to render a fair and impartial verdict on the evidence in conformity with RCr 9.36 from body language, tone of voice, and vocal inflections, we have generally afforded the trial courts much deference. *See Gabbard v. Commonwealth*, 297 S.W.3d 844, 853 (Ky. 2009) (finding deference to trial court appropriate when juror hesitated after asked a question, but deference less appropriate when a juror clearly stated they already formed an opinion about the case and thought the defendant was guilty). "It is largely because of the familiarity both with what occurs during voir dire and the community that '[t]he law recognizes that the trial court is

14

vested with broad discretion to determine whether a prospective juror should be excused for cause.'" *Id.*

Here, Juror Page had the unpleasant experience of being questioned by a student of hers whose father was a sheriff following an acquittal in a case on which she served as a juror. Yet, when asked if this experience, coupled with the fact that she is currently teaching one of the prosecutor's children, would make her uncomfortable to return a verdict of acquittal if she felt that was the right thing to do, she indicated that the situation would not prevent her from doing her service. In *Stopher*, 57 S.W.3d at 797 (Ky. 2001), we found no error where the trial court failed to strike a juror for cause based on the juror's unpleasant prior experience serving on a jury. In that case, a potential juror "voiced concern about an unpleasant experience serving as a juror in 1981. Specifically, she felt that she had been coerced by the jury foreperson to acquit a defendant who later committed a murder." *Id.* In "[g]iving due deference to the opportunity of the trial court to observe the demeanor of the prospective jurors and understand the substance of their answers to voir dire questions," and noting that the juror did not express any opinion as to the guilt of the appellant or any prejudged beliefs about the case, this Court found no error. *Id.* Both Juror Page and the juror in *Stopher* had unpleasant consequences from acquitting a criminal defendant but nevertheless indicated that they would be able to render a fair and impartial verdict based on the evidence before them, even should that verdict be acquittal.

15

Similar to the reasoning above regarding Juror Harper, Stinson's argument that Juror Page should have been stricken for cause based on her indications that she would miss her students and their education would suffer is meritless. The standard under RCr 9.36(1), which is the only standard for determining whether a juror should be stricken for cause, is whether the prospective juror can "render a fair and impartial verdict on the evidence." *Sturgeon*, 521 S.W.3d at 193. Stinson fails to show how missing work would cause Juror Page to be unfair or partial to either Stinson or the Commonwealth. While missing work would pose some inconvenience to Juror Page, there is no indication that this inconvenience would translate to prejudice against Stinson. We hold that the trial court did not abuse its discretion in denying Stinson's motion to strike Juror Page for cause from the jury pool.

**Juror Wright**

On the first day of voir dire, Juror Wright disclosed that she cares for her elderly mother in Bowling Green and must leave at 4 p.m. every day to relieve the sitter. She also disclosed that her husband was friends with Jerry Farris, victim Sue Farris' predeceased husband. Juror Wright stated that her husband conducted Jerry Farris' eulogy. Juror Wright also disclosed that she worked with the city police and her husband was related to a Kentucky State Police trooper. When asked whether those relationships would impede her ability to listen to the evidence and the witnesses, Juror Wright replied, "no."

16

She was then asked whether she could be fair and impartial, to which she responded, "I think so."

During individual voir dire, Juror Wright was asked whether she was personally acquainted with either victim, Sue Farris or Matthew Blakely. Juror Wright answered, "No." The trial court then asked whether she was acquainted with any of the victims' relatives. Juror Wright explained that her husband was friends with Jerry Farris and "did his eulogy." Juror Wright denied being friends with Sue Farris and stated that she "really didn't know her." Juror Wright explained that her husband was a basketball coach, and he met Jerry because Jerry attended all the sporting events. Juror Wright disclosed that she started a new job with the city of Cadiz three weeks prior and was still in training.

In response to questions from defense counsel, Juror Wright explained that, although she and her husband were friends with Jerry Farris, she had personally only met Sue Farris two or three times and was "not really" acquainted with her. Defense counsel asked whether Jerry attended their church, and Juror Wright answered in the negative. Juror Wright then acknowledged that she worked with city police officers through her new employment but denied that this would cause her to favor their testimony over other witnesses. Juror Wright likewise denied that her husband being cousins with a Kentucky State Police Trooper would cause her to favor Kentucky State Police's testimony.

Defense counsel moved to strike Juror Wright for cause on the grounds that she worked with city police officers, her husband was related to a Kentucky State Police trooper, that she had prior commitments to provide care to her elderly mother, and that she had mentioned having a medical appointment for her thyroid. The trial court declined to strike Juror Wright for cause, stating that there was no reason to excuse her.

On appeal, Stinson argues that the trial court abused its discretion in overruling his motion to strike Juror Wright for cause, claiming that Juror Wright's "close relationships" called "into doubt her impartiality." In support, Stinson claims that Juror Wright's husband's friendship with Sue Farris' husband, her husband's acquaintanceship with Sue Farris, her employment with the city which facilitated familiarity with the city police, and her husband's relation to a Kentucky State Police trooper provided sufficient grounds to doubt her impartiality.

The question we are presented with is whether Juror Wright's relationships were sufficiently close that the trial court's refusal to strike for cause was an abuse of discretion. "There are occasions when, despite the juror's answers, a juror's 'familial, financial or situational' relationship with the parties will be sufficient to sustain a motion to strike for cause, where such relationships are likely to 'subconsciously affect [the juror's] decision in the case.'" *Little v. Commonwealth,* 422 S.W.3d 238, 242 (Ky. 2013). "[I]rrespective of the answers given on voir dire, the court should presume the likelihood of prejudice on the part of the prospective juror because the potential juror has

18

such a close relationship, be it familial, financial or situational, with any of the parties, counsel, victims, or witnesses." *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky. 1985). In determining whether a relationship is so close as to be presumptively prejudicial, we have also said:

> As for jurors with some relationship to the case, the trial court must distinguish between those whose objectivity, whose "indifference," remains intact and those so closely related to the case or so susceptible to the relationship as to be predisposed to be more (or less) critical of one side's evidence than the other's. In all cases these distinctions are to be based on the totality of the voir dire circumstances: the juror's demeanor, the context of any questions, and the entirety of the juror's responses. Where the juror's responses and the rest of the circumstances have created a genuine doubt as to the juror's impartiality, further questioning meant to resolve the doubt by eliciting further information is certainly appropriate, but leading questions calling for "impartial" answers do not "cure" or "rehabilitate" prospective jurors whose relationship to some important aspect of the case is so close as to be presumptively disqualifying, or who in some other way have already made their disqualification apparent. Again, "where questions about the impartiality of a juror cannot be resolved with certainty, or in marginal cases, the questionable juror should be excused."

*Futrell*, 471 S.W.3d at 272–73 (internal citations omitted). Here, again, the trial court must use its discretion to evaluate the conduct of and answers given by prospective jurors to determine their ability and willingness to be fair and impartial. That discretion is afforded deference.

In *Sanders v. Commonwealth*, 801 S.W.2d 665, 669 (Ky. 1990), we found no abuse of discretion where the trial court failed to strike a juror who was business acquaintances with the victim and who stated they liked the victim but who described the relationship as a casual one. The potential juror disclaimed any preconceived notion of guilt or innocence towards the accused and indicated to the court that they could remain fair and impartial despite

19

their relationship with the victim. *Id.* This Court stated that, "[t]he record does not persuade us that this juror had such a close situational relationship with the victim as to compel a presumption of bias." *Id.* at 670.

Here, the relationship between Juror Wright and Sue Farris was likewise distant. Juror Wright stated that she "didn't really know" Sue, would not consider Sue a friend, and had only met Sue two or three times. "[A] casual acquaintance [is] not the close relationship needed to imply bias on the part of the juror." *Graham v. Commonwealth*, 319 S.W.3d 331, 338 (Ky. 2010). Given that Juror Wright in no way indicated that her relationship with Sue Farris or Jerry Farris would influence her ability to remain impartial and fair, the trial court did not abuse its discretion in declining to strike Juror Wright for cause based on any ties to Sue Farris.

For similar reasons, the trial court did not abuse its discretion in failing to strike Juror Wright for cause based on her husband having a cousin who is a Kentucky State Police trooper or her working for the city of Cadiz and having some sort of exposure to the city police. Juror Wright's husband's cousin, the Kentucky State Police trooper, was not a party to this case or involved in any way. Merely knowing *any* police officer, even one that works for an agency involved in a criminal case, is not enough to presumptively bias a juror where the juror insists that they can be fair and impartial. In the same vein, merely working for the city, which also employs police officers, is insufficient alone to establish bias, particularly where any working relationship began at most three weeks prior. Again, Juror Wright indicated that this working relationship

20

would not influence her evaluation of the evidence. While the nature of Juror Wright's employment with the city was unclear from the record, and we could speculate situations in which the working relationship would be so close as to presumptively bias the juror, here, that evidence is lacking. The burden of proving bias and the resulting prejudice is on the party alleging bias. *Cook v. Commonwealth*, 129 S.W.3d 351, 357 (Ky. 2004). Stinson has failed to meet this burden. There is insufficient evidence to conclude that Juror Wright was inherently biased. Therefore, the trial court did not err in failing to strike Juror Wright for cause.

## B. The trial court did not err in allowing evidence contested by defendant under KRE 404(b) to be admitted.

Prior to trial, the Commonwealth provided notice and a supplemental notice of its intent to introduce KRE 404(b) evidence, specifically:

a. Evidence the defendant was observed snorting white powder by his ex-girlfriend, Taylor Creed, two (2) days prior to the murders.

b. [Testimony by Stinson's mother that] the defendant used cocaine and marijuana prior to July 2, 2021, . . . and [that this led to] disagreements with the victim, Sue Farris.

c. Evidence the defendant and the victim, Matthew Blakely, communicated via text messages which indicate the victim and the defendant intended to obtain controlled substances and split between them. Additionally, text messages proving drug usage (marijuana and cocaine) between the defendant and the victim, Matthew Blakely.

d. Evidence, from the defendant's statement, that the defendant went to victim's residence to obtain marijuana from Matthew Blakely. Statement from defendant he left the residence without the marijuana. Evidence of marijuana that was later found in Matthew Blakely's truck on July 31, 2023. Text messages received from a drug dealer named "Fin" and an interview with "Fin" indicating the victim, Matthew Blakely, received marijuana

21

from "Fin" just prior to the murders but was unable to obtain the cocaine requested.

e. Evidence of the defendant's drug use at the crime scene and outside his residence. Cocaine residue located in the bedroom at the victim's residence and paraphernalia with residue in the wood line near defendant's home near his cell phone.

A hearing was held on July 31, 2023. Stinson objected to the introduction of this evidence, arguing that there had been no evidence to show that he was under the influence of any controlled substances at the time the murders were committed. Stinson argued that these prior bad acts had "failed to establish or contribute to the murder of [Sue] Farris or [Matthew] Blakely" and therefore had no direct connection to a motive.

The trial court initially issued an order allowing all the evidence to be admitted except evidence that Kathy Farris found marijuana in Matthew's truck two years after the murders. The trial court ruled that the evidence that Stinson snorted white powder two days prior to the murder is relevant and probative to show state of mind at the time of the murders and motive. The trial court ruled that Rhonda Neighbors' testimony concerning Stinson's cocaine and marijuana use prior to July 2, 2021, was relevant and probative to show that Stinson only exhibited anger issues with Sue Farris when he was using substances. The trial court ruled that the text messages between Stinson and Matthew were relevant and probative "in that it establishes drug procurement activity between the defendant and the victim prior to the murders," and could be offered to prove motive. The trial court ruled that Stinson's statements that he went to the victim's residence without getting

22

marijuana were relevant and probative and could be offered as a motive. The trial court ruled that the statements from "Fin" and text messages indicating Matthew received marijuana but not cocaine from "Fin" prior to the murder were relevant and probative and could be used to prove motive. Lastly, the trial court ruled that evidence of Stinson's drug use at the crime scene and outside of his residence was relevant and probative of motive and his behavior when using substances. For each piece of evidence the trial court ruled admitted, the trial court found each to be so "inextricably intertwined with the other evidence that separation would offer serious adverse effect to the Commonwealth."

The trial court excluded the evidence regarding the marijuana in Matthew's truck out of concern about the amount of time that had passed from the time of the murders to the discovery of the marijuana and, because during this time, there was a timespan of about a week when the truck was not fully secured. However, Stinson filed a motion to reconsider, arguing that if the evidence of Matthew procuring the marijuana and evidence that Stinson later told police he did not obtain the marijuana from Matthew is admitted, the evidence that marijuana consistent with the marijuana Matthew picked up that day was later found in Matthew's truck should also be admitted. Stinson argued that he should be afforded the opportunity to admit the evidence to support his assertion that he did not obtain the marijuana from Matthew and to question the credibility of the Kentucky State Police's search of Matthew's truck. The trial court ultimately admitted this evidence, finding that the

23

evidence could be considered exculpatory in that it allowed Stinson to present evidence to break the inference that he killed the victims to steal or take the marijuana.

On appeal, Stinson argues that the trial court abused its discretion by allowing the KRE 404(b) evidence. Like in the trial court, Stinson claims that there was nothing linking the murders to the evidence concerning drugs, and that the evidence "was only brought in for the improper purpose of showing he was of bad character" in contradiction of *Chavies v. Commonwealth*, 374 S.W.3d 313, 321 (Ky. 2012). Stinson argues that "At most, the Commonwealth proved that [Stinson] and Matthew obtained some marijuana together and were unable to get any cocaine. Whatever little relevance that evidence the drugs had to the murders was greatly outweighed by the prejudicial effect of casting [Stinson] in a bad light." As a result, Stinson argues that his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 2, 7, and 11 of the Kentucky Constitution have been violated. On this theory, Stinson requests reversal of his conviction and a new trial.

The Commonwealth, on the other hand, argues that "considering that Stinson and Matthew were entrenched in buying and using drugs, and Stinson was going to pick up drugs from Matthew at the time of the murders, 'there was clearly a sufficient inferential connection to allow the introduction of the drug evidence under the motive exception.' [*White v. Commonwealth*, 178 S.W.3d 470, 477 (Ky. 2005)]."

KRE 404(b) states:

24

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

"[T]he unaltered proposition of [KRE 404(b)] is that 'evidence of criminal conduct other than that being tried, is admissible only if probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character.'" *Bell v. Commonwealth*, 875 S.W.2d 882, 888–89 (Ky. 1994). "Because the degree of potential prejudice associated with evidence of this nature is significantly higher, exceptions allowing evidence of collateral criminal acts must be strictly construed" and are "well-defined in the rule itself." *Id.* at 889 (internal quotation marks omitted).

"We review a trial court's decision to admit prior bad acts evidence for an abuse of discretion." *Lopez v. Commonwealth*, 459 S.W.3d 867, 874 (Ky. 2015) (citing *Commonwealth v. King*, 950 S.W.2d 807, 809 (Ky. 1997)). "A court abuses its discretion if its decision 'was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Id.* (citing *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007)).

In *Bell*, we set out a three-part inquiry "which together, provide a useful framework for determining the admissibility of other crimes evidence." 875

25

S.W.2d at 889–91. The first question, referred to as the "relevance" inquiry, is whether "the other crimes evidence [is] relevant for some purpose other than to prove the criminal disposition of the accused." *Id.* at 889. The next question, referred to as the "probativeness" inquiry, is whether "evidence of the uncharged crime [is] sufficiently probative of its commission by the accused to warrant its introduction into evidence." *Id.* at 890. The last question, referred to as the "prejudice" inquiry, is whether "the potential for prejudice from the use of other crimes evidence substantially outweigh[s] its probative value." *Id.*

Concerning the relevance inquiry, the evidence the Commonwealth sought to introduce was highly relevant — in fact, the Commonwealth's entire theory of the case was that Stinson and Matthew's drug activity was the motive behind the murders. This situation falls squarely under *Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012), in which we said:

> There are certain aspects of the case that are so intertwined with the other evidence that they must be admitted in order to paint an accurate picture of the events in question. One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence furnishes part of the context of the crime or is necessary to a full presentation of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order to complete the story of the crime on trial by proving its immediate context or the "res gestae," or the uncharged offense is so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other, and is thus part of the res gestae of the crime charged.

(cleaned up). Likewise, here, the Commonwealth would have suffered serious adverse effect in proving their case absent the drug-related evidence.

26

Concerning the probativeness inquiry, the evidence sought to be admitted by the Commonwealth was sufficiently probative of its intended purpose to show that Stinson used drugs, was hostile around Sue when he used drugs, and that Stinson and Matthew had planned to purchase drugs together on the day of the murders. This evidence, in combination with the circumstances surrounding the murders and taken in combination with the other evidence, is sufficiently probative of a motive for Stinson to murder his aunt and cousin.

Concerning the prejudice inquiry, Stinson claims that the evidence of drug use was unduly prejudicial. However, not all evidence that is prejudicial is unduly prejudicial. In *Wilson v. Commonwealth*, 199 S.W.3d 175, 181 (Ky. 2006), we stated that "[w]hile possession of marijuana is a serious crime, evidence of such a crime is not so prejudicial as to preclude its introduction for the purpose of establishing a motive for a murder." While other crimes may always be viewed prejudicial against a criminal defendant, there is no indication that the evidence in question here was unduly prejudicial when viewed in light of its probativeness of a motive for murder and its inseparability from the remaining evidence.

Stinson's argument that even if he and Matthew were engaged in buying and using drugs together, there was no connection between this drug use and a motive to kill Matthew and Sue lacks merit. In applying the motive exception in KRE 404(b) to the exclusion of evidence, we have allowed the other crime to fall under the motive exception even when the connection between the other

27

crime as a motive for the charged crime was deduced by a reasonable inference as opposed to direct witness testimony. *White*, 178 S.W.3d at 476. That drugs would have been the motive behind the murder of a co-drug user by the last person known to have seen the victims alive, who had planned to stop by the home to complete the drug exchange but discovered that the victim was unable to acquire cocaine as previously agreed, is a "sufficient inferential connection to allow the introduction of the drug evidence under the motive exception." *Id.* at 477. The trial court did not abuse its discretion by allowing this evidence to be admitted.

## C. Stinson did not invoke his right to counsel when he stated, "I think it would probably be safe for me to have a lawyer. I kind of see where this is going."

After Stinson was found walking along the highway by California officers, Sergeant Dick flew to Los Angeles, California to question Stinson about the murders and extradite him back to Kentucky on the drug charges. During the questioning, Stinson mentioned obtaining counsel two separate times. The first time, Stinson stated, "I think it would probably be safe for me to have a lawyer. I kind of see where this is going." Sergeant Dick continued questioning Stinson until Stinson unambiguously stated, "I would really want to talk to a lawyer, at this point." At this point, Sergeant Dick ceased the questioning.

Prior to trial, Stinson moved to suppress the statements he made to Sergeant Dick after his first mention of a lawyer, alleging that Sergeant Dick's failure to cease all questioning at this point violated his United States Constitution Fifth Amendment and Kentucky Constitution Section 11 rights

28

against self-incrimination. In denying this motion, the trial court ruled that Stinson did not invoke his right to an attorney until he stated, "I would really want to talk to a lawyer, at this point," and that his prior statements regarding counsel were equivocal and ambiguous.

On appeal, Stinson asserts that the failure to stop all questioning after he first mentioned speaking with an attorney violated his Fifth Amendment[4] right against self-incrimination and Sections 2 and 11 of the Kentucky Constitution.[5] Properly preserved motions to suppress are subject to review as a mixed question of law and fact. *Ellis v. Commonwealth*, 694 S.W.3d 294, 300 (Ky. 2024). "We review the trial court's findings of fact for clear error and the application of law *de novo*." *Id.*

*Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966), sets forth the standard for the Fifth Amendment to the United States Constitution right to counsel:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner

---

[4] Fifth Amendment to the United States Constitution, incorporated to the states through the Fourteenth Amendment.

[5] Stinson focuses his arguments on case law, both federal and state, interpreting the application of *Miranda v. Arizona*, 384 U.S. 436 (1966), and fails to expand on his claims regarding the Kentucky Constitution beyond the mere allegation that Sections 2 and 11 had been violated. Nevertheless, "Kentucky decisions generally hold Section 11 to be coextensive with the Fifth Amendment." *Welch v. Commonwealth*, 149 S.W.3d 407, 410 (Ky. 2004). Presumably, Stinson intends a claim that his rights under Section 2 of the Kentucky Constitution were violated to piggyback off of any Section 11 violation through Section 2's protections against absolute and arbitrary governmental power. In this regard, we base our analysis on state and federal authority interpreting Amendment 5 to the United States Constitution.

and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

"Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). "'[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, . . . the cessation of questioning' is not required." *Smith v. Commonwealth*, 520 S.W.3d 340, 350 (Ky. 2017) (quoting *Davis*, 512 U.S. at 459). "If the statement fails to meet the requisite level of clarity," officers do not have to stop questioning the suspect. *Davis*, 512 U.S. at 459.

Stinson's statement was that "I think it would probably be safe for me to have a lawyer. I kind of see where this is going." Applicable precedent instructs us to find this statement ambiguous and equivocal in light of the circumstances. *Compare Davis*, 512 U.S. at 459 (finding "[m]aybe I should talk to a lawyer" to be equivocal and ambiguous, not invocation of counsel), *and Brown v. Commonwealth*, 416 S.W.3d 302, 308 (Ky. 2013) (holding "If I want a lawyer how soon could you make that happen?" and "So is that gonna take like a long time or weeks or months, or can you make one happen like ASAP?" not invocation of right to counsel)*, and Smith*, 520 S.W.3d at 349–50 (finding "I'd

30

just rather have my lawyer present" not invocation of right to counsel), *and Quisenberry v. Com*monwealth, 336 S.W.3d 19, 33–34 (Ky. 2011) (holding "can I tell my lawyer the real story and he tell y'all?" not invocation of right to counsel)*, with Bradley v. Commonwealth,* 327 S.W.3d 512, 518 (Ky. 2010) (holding "I need a lawyer or something," was unequivocal and unambiguous invocation of right to counsel, noting a lack of "commonly encountered signs of equivocation that would support a conclusion that the suspect has not unequivocally invoked his right to counsel" such as declaring that "maybe" he needs a lawyer, or that he "might" need a lawyer, or asking if he needs a lawyer).

Stinson's statement that *he thinks* it *would probably be safe* for him to have a lawyer is more akin to an offhand comment or a verbalization of his thoughts than an outright request for a lawyer. At best, reasonable minds could differ as to whether he requested a lawyer. "[I]f reasonable minds could differ on whether a request for an attorney had been made, the language is perforce ambiguous or equivocal." *Bradley*, 327 S.W.3d at 516. The trial court did not abuse its discretion in admitting statements made by Stinson after he stated "I think it would probably be safe for me to have a lawyer. I kind of see where this is going" and until he stated, "I would really want to talk to a lawyer, at this point."

**D. The trial court did not abuse its discretion in denying Stinson's motion for a new trial.**

On the sixth day of trial, defense counsel disclosed to the trial court that Sergeant Dick, who was seated at the Commonwealth's table during the trial, "ha[d] made facial expressions, or rolled his eyes, smiled, smirked, etc., as other witnesses have testified" and argued that his behavior was a form of non-verbal communication commenting on the credibility of witnesses. Defense counsel pointed out that, being with the Commonwealth, a trooper, and a sergeant, Sergeant Dick was "clothed with some aura of respectability" and argued that "there's the possibility, maybe probability, that over time, we're at day six, that it could influence the jury if he keeps doing that. I think that's something the Commonwealth can ask him not to do." Defense counsel explained that this behavior mostly occurred during Stinson's cross-examination of the Commonwealth's witnesses. The Commonwealth denied noticing the behavior but promised to talk to him.

Two days later, after Stinson had delivered his closing arguments, defense counsel again approached the court and reported that numerous people have confirmed that Sergeant Dick had continued to "act out," going as far as to mouth words such as "that's not true" to the jury several times. Defense counsel stated that they had personally noticed such a "commotion like that" one time but "didn't take the time to pinpoint it." The trial court commented on its inability to observe the witness from the bench, as there was a lamp blocking the view. Defense counsel suggested that Sergeant Dick be

"admonished again." The Commonwealth again denied seeing any of this behavior but promised to speak with him again.

After trial, Stinson moved for a new trial, stating that Sergeant Dick's behavior, among other things, deprived Stinson of a fair trial. An affidavit by Stinson's attorney was attached to the motion, which stated, "Throughout the trial, counsel observed [Sergeant Dick] sitting at the prosecution table making gestures and exaggerated facial expression designed to suggest his disapproval of the evidence presented. Most troubling, however, I observed Sgt. Dick mouthing words while witnesses testified and while defense counsel made arguments."

A hearing on Stinson's motion for a new trial was held on January 3, 2024. The following witnesses testified at this hearing: Attorney Christian Woodall, co-counsel for the defendant; Angela Fish, friend of Stinson's family; Sandra Carnahan, Stinson's aunt; Kaitlin Shiro, Stinson's sister; Rhonda Neighbors, Stinson's mother; Taylor Creed, Stinson's ex-girlfriend; Kathy Cravens, Taylor Creed's mother; Melissa Brown, court bailiff and court security officer for Trigg County Sheriff's Office; and Assistant Commonwealth's Attorney Jill Giordano. No juror was called as a witness.

Attorney Christian Woodall testified that he observed Sergeant Dick making facial expressions several times during the trial to show disapproval or approval of testimony being made. Attorney Woodall recalled that during Detective Hill's cross-examination, Sergeant Dick mouthed the words, "no, it isn't" or "yes, we did." Attorney Woodall testified that he believed Sergeant

33

Dick was seated directly in sight of the jury and that the jury was seated when Sergeant Dick engaged in this behavior. Attorney Woodall acknowledged that defense counsel did not move for a mistrial during the trial based on the alleged conduct by Sergeant Dick. Attorney Woodall was not able to relay which jurors were looking at Sergeant Dick when he was making these faces, nor was he able to confirm that any juror saw Sergeant Dick make any nonverbal expression. Attorney Woodall testified that, given the layout of the courtroom and the exaggerated nature of Sergeant Dick's behavior, the jury would have likely seen Sergeant Dick's actions, but he did not personally observe any particular juror observing Sergeant Dick's actions. Ultimately, Attorney Woodall could offer no proof that any juror actually saw any actions by Sergeant Dick or was affected by them.

Angela Fish testified that she observed the trial from the left side of the courtroom close to the wall. She testified that she noticed Sergeant Dick nodding his head in agreement and shaking his head is disagreement several times, and during closing arguments he appeared very happy by throwing his hands up and smiling. She testified that these actions captured her attention, but she did not notice if any juror also observed Sergeant Dick's actions.

Sandra Carnahan testified that she was seated in the second or third row on the left side of the courtroom. She testified that it was difficult to focus on any testimony from witnesses because of the way Sergeant Dick was moving his head and arms in response to the testimony being given. She testified that he appeared very proud and happy by his conduct. She testified that the jury

34

was in the courtroom when he engaged in this behavior. She testified that she did not personally observe any juror looking at Sergeant Dick at the time he allegedly made the faces but found it unlikely that the jury would not have noticed it.

Kaitlin Shiro testified that she was a witness in the case, so she was not able to observe the trial until close to the end of the trial. She stated that Sergeant Dick was seated almost directly in front of the jury. She described Sergeant Dick's actions as "charades," explaining that he would "use his body motions, his mouth was open," and she described his conduct as a "constant distraction." She explained that his bodily movements were so dramatic that she had no choice but to notice them. She stated that she was sitting in the first or second row behind the jury, and she could see the juror's heads and necks turn towards Sergeant Dick at times. She was unable to recall which specific jurors had turned towards him.

Rhonda Neighbors testified that she was a witness in the case, so she was not able to observe the trial until closing arguments. She testified that she observed Sergeant Dick throw himself back in the chair, throw his hands up, and mouth words when defense counsel spoke about law enforcement failing to follow up on leads or send out fingerprints. She testified that she noticed several jurors turn their heads toward Sergeant Dick but could not identify which specific jurors did so.

Taylor Creed testified that she was a witness in the case, so she was not able to observe part of the trial. She testified that while other witnesses were

35

testifying to the jury, she observed Sergeant Dick shaking his head and mouthing, "no I didn't" or "yes I did." She testified that she observed several jurors' heads turn toward Sergeant Dick when he engaged in this behavior, but she was unable to identify specific jurors who noticed the behavior.

Kathy Cravens testified that she was present during the testimony of Cadiz Police Chief Duncan Wiggins. She testified that she was able to observe Sergeant Dick's face during Chief Wiggins' testimony and it appeared very animated. She testified that she observed him mouthing words. She testified that some of the jurors turned to face Sergeant Dick instead of the witness. She was unable to identify specific jurors but observed some of their heads shifting.

Melissa Brown testified that she was working as court security during Stinson's trial. She denied that any member of the jury alerted her to anything about Sergeant Dick's behavior.

Jill Giordano testified that she assisted as co-counsel for the Commonwealth during Stinson's trial and sat at counsel table next to Sergeant Dick. She denied noticing any distracting behavior by Sergeant Dick during the trial. She likewise denied noticing any jurors turning to Sergeant Dick during the trial. She acknowledged remembering that defense counsel approached the court twice during the trial regarding Sergeant Dick's behavior and the Commonwealth agreeing to speak with Sergeant Dick.

The Commonwealth argued to the trial court that there was no proof that anything Sergeant Dick did influenced the jury. It argued that, had Sergeant

36

Dick's behavior been serious enough to warrant a new trial, the defense would have moved for a mistrial during the trial. Stinson argued that he did bring Sergeant Dick's behavior to the court's attention during trial, based solely on what Attorney Woodall had observed. He argued that it was not until after the trial that the defense counsel realized that Sergeant Dick's behavior was as egregious as it was. Stinson argued that any attempt of a party or witness to communicate with the jury other than through the testimony given on the witness stand is error.

The trial court issued an order denying Stinson's motion for a new trial, stating,

> While the defendant produced witnesses to attest Sgt. Dick was behaving in an inappropriate manner in the presence of the jury, the proof is insufficient of any influence on the jury that would constitute a new trial. Even if Sgt. Dick did engage in inappropriate conduct during the trial, there is no evidence or proof that the jury was influenced by anything he may or may not have done. The Court did not witness or observe any outbursts. Further, the defendant only addressed two occurrences on the record and could have moved for a mistrial if he believed the conduct was serious enough.

The trial court also noted that it reviewed camera footage of the trial, but the video footage was too grainy to be of use. This Court likewise reviewed the camera footage provided in the record, but Sergeant Dick was out of view during most of the trial. As a result, neither the trial court nor this Court has been able to either confirm or deny Stinson's allegations.

On appeal, Stinson argues that he is entitled to a new trial in accordance with RCr 10.02 and *Sharp v. Commonwealth*, 849 S.W.2d 542, 546–47 (Ky. 1993). A trial court's ruling on a motion for new trial is reviewed for an abuse

37

of discretion. *Taylor v. Commonwealth*, 175 S.W.3d 68, 71 (Ky. 2005). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "The trial judge [is] in the best position to determine whether any remedial action [is] necessary to preserve decorum and ensure a fair trial." *Wilson v. Commonwealth*, 836 S.W.2d 872, 890 (Ky. 1992), *overruled on other grounds by St. Clair*, 10 S.W.3d 482.

RCr 10.02 states, in relevant part, that "[u]pon motion of a defendant, the court may grant a new trial for any cause which prevented the defendant from having a fair trial, or if required in the interest of justice." Of the elements of a fair and impartial trial, our predecessor court has stated,

> Perhaps no precise definition can be given it [a fair trial], but it certainly must be one where the accused's legal rights are safeguarded and respected. There must not only be a fair and impartial jury and a learned and upright judge to instruct the jury and pass upon the legal questions, but there ought to be an atmosphere of calm, in which the witnesses can deliver their testimony without fear and intimidation, and in which the fear and intimidation, and in which the attorneys can assert the defendant's rights freely and fully, and in which the truth may be received and given credence without fear of violence.

*Raney v. Commonwealth*, 153 S.W.2d 935, 937 (Ky. 1941) (alteration in original).

In *Sharp*, this Court stated that

> the question for the court when faced with a motion for mistrial is whether the impropriety would likely influence the jury. As it is impossible to catalog the myriad occurrences which might provoke a motion for mistrial, courts generally hold that the trial court is

vested with broad discretion to determine whether a mistrial is necessary upon the occurrence of courtroom misconduct.

849 S.W.2d at 547. Noting that a "bystander [gesturing] to the child witness during the child's testimony" bolstered her demeanor during testimony and her ability to withstand cross-examination, "inevitably influenc[ing] the jury as to whether or to what extent she should be believed," this Court found "the violations . . . so egregious and inimical to the concept of a fair trial that they cannot be disregarded in the name of trial court discretion." *Id.*

The Commonwealth argues that instead of applying RCr 10.02, the more appropriate Rule is RCr 10.04, which states that, "A juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot." The Commonwealth argues that a relevant exception to that Rule is that "jurors are permitted to testify as to any outside influences that may have played an inappropriate role in the jury's deliberations." *Ford v. Commonwealth*, 628 S.W.3d 147, 158 (Ky. 2021). According to the Commonwealth, "it was incumbent on Stinson to question jurors and to present their testimony to support his claim," and failure to question jurors about any influence Sergeant Dick's behavior had on them meant that Stinson failed to meet his burden.

The Commonwealth compares this situation with *Hammond v. Commonwealth*, 504 S.W.3d 44 (Ky. 2016), wherein the appellant argued that his right to a fair trial was violated "because some individuals, presumably the victim's friends or family members, wore t-shirts at the trial displaying [the

victim]'s picture along with the message, 'We will Never Forget.'" *Id.* at 49. In declining to find prejudice, this Court noted that there was no evidence that any jurors actually saw the messages on the shirts. We said:

> [H]ere some victim support t-shirts were worn in the courtroom during the trial. However, Appellant is unable to show that any jurors were exposed to the message or were even aware of their presence. The trial court specifically found that the t-shirts did not create "an intimidating environment for the jury," and the Monroe family was admonished to be mindful of the t-shirts. Appellant did not ask to examine the jury on the issue to establish a more complete record for our review. Since we cannot conclude with any assurance of accuracy that any jurors actually saw the messages, we cannot say that Appellant suffered actual prejudice from the limited display tolerated by the trial judge. The record is otherwise silent on the extent to which victim support messages were displayed in the courtroom and the extent to which jurors were exposed to, or affected by, them. We will not presume prejudice from a silent record.

*Id.* at 51. Here, however, the record is not silent. Four witnesses to the trial testified that they observed heads turning toward Sergeant Dick as he was engaging in the expressive conduct. We have, in the past, presumed prejudice from spectator misconduct even in the absence of direct testimony from affected jurors. *See Sharp*, 849 S.W.2d at 547 (discussing that "this Court reversed a conviction in part upon improper conduct by spectators and its presumed effect upon the jury" in *Raney*, 153 S.W.2d at 938). Therefore, the Commonwealth's argument that "it was incumbent on Stinson to question jurors and to present their testimony to support his claim. . . . [N]o jurors testified about any extraneous influence; in fact, no jurors testified at all. Thus, Stinson failed to meet his burden here," is erroneous as a matter of law insofar

as it implies that without juror testimony, a defendant automatically fails to meet his or her burden of proof of influence.

Nevertheless, Stinson still had the burden to prove that Sergeant Dick's actions influenced the jury. The trial court found that "the proof is insufficient of any influence on the jury that would constitute a new trial. Even if Sgt. Dick did engage in inappropriate conduct during the trial, there is no evidence or proof that the jury was influenced by anything he may or may not have done." The question, then, is whether the trial court abused its discretion in finding that Stinson had failed to meet his burden of proof in showing influence on the jury.

There is no doubt that the alleged behavior by Sergeant Dick, if it occurred, was inappropriate courtroom behavior and unbecoming of a sergeant with at least twelve years of law enforcement experience at the time. Likewise, the trial court does not indicate, and leaves us to wonder, why the lamp obscuring the trial court's view of Sergeant Dick was not moved, if it could be, after his actions were first brought to the trial court's attention so that the trial court could adequately monitor the situation. Further, while the trial court states that it did not admonish the jury to disregard Sergeant Dick's actions because the court did not personally observe the actions nor was it requested by Stinson, the responsibility "to control the decorum and conduct of those in the courtroom to ensure that neither the defendant nor the Commonwealth is denied a fair trial" belongs to the judge. *Allen v. Commonwealth*, 286 S.W.3d 221, 230 (Ky. 2009). "A judge has a right and obligation to maintain control

41

over his own courtroom so as to minimize or prevent activities that might distract the jurors during the course of the trial." *Fugate v. Commonwealth*, 62 S.W.3d 15, 21 (Ky. 2001).

Nevertheless, not all improper or questionable conduct results in prejudice to the defendant. Here, the trial court conducted a hearing on the motion for a new trial and heard testimony from nine witnesses, most of whom were aligned with the defendant and none of whom were jurors. The court failed to observe the alleged outbursts by Sergeant Dick, indicating some limit to how disruptive this behavior could have been. Taken together, the trial court did not abuse its discretion in failing to find that the jury had been unduly prejudiced by Sergeant Dick's alleged actions and in denying Stinson's motion for a new trial.

This Court now avails itself of the opportunity to describe best practice in this or similar situations. We strongly urge our trial courts to make every effort to personally observe potentially disruptive conduct brought to their attention and, if such conduct is indeed validated by the trial court, a strong admonition to the offending party is warranted. If courtroom decorum is significantly breached, then an admonition to the jury regarding same, whether requested or not by a party, may be warranted.

**E. Reversal is not required under the cumulative error doctrine.**

Stinson contends that his convictions should be reversed on the basis of cumulative error. The cumulative error doctrine states that where there are "multiple errors, although harmless individually, [the errors] may be deemed

reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Stinson claims that if the asserted errors do not individually warrant reversal, then the cumulative effect of the errors requires reversal. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. *Funk v. Commonwealth*, 842 S.W.2d 476, 483 (Ky. 1992).

Because cumulative error only applies when there is an accumulation of errors, it is inapplicable where, as here, no error was made. Stinson is not entitled to a reversal under the cumulative error doctrine.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. Lambert, C.J.; Bisig, Goodwine, Nickell and Thompson, JJ., concur. Conley, J., concurs in result only.


COUNSEL FOR APPELLANT:

Adam Meyer
Robert C. Yang
Assistant Public Advocates


COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

James Grant Burdette
Assistant Attorney General